THE LAW OFFICE OF ARTHUR I. UNGERMAN
Arthur I. Ungerman
SBN: 20391000
Attorney at Law
12720 Hillcrest Road
Suite 625
Dallas, Texas 75230
(972) 239-9055 Telephone
(972) 239-9886 Facsimile
arthur@arthurungerman.com

Joyce W. Lindauer, PLLC
Joyce Lindauer
SBN: 21555700
12720 Hillcrest Road
Suite 625
Dallas, Texas 75230
 (972) 503-4033 Telephone
(972) 503-4034 Facsimile
joyce@joycelindauer.com
ATTORNEYS FOR DEBTOR

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **MMD HOTEL CORINTH, LLC** | § **CASE NO: 15-60013-11** | |
| | § | |
| | § | |
| | § | |
| | § **CHAPTER 11** | |
| **Debtor.** | § | |

### DISCLOSURE STATEMENT DATED MARCH 9, 2015

## TABLE OF CONTENTS

ARTICLE I – INTRODUCTION ................................................................ 3

ARTICLE II - REPRESENTATIONS......................................................... 9

ARTICLE III - FINANCIAL PICTURE OF THE DEBTOR ....................................... 11

ARTICLE IV - ANALYSIS AND VALUATION OF PROPERTY........................................... 14

ARTICLE V- SUMMARY OF THE PLAN ............................................................. 15

ARTICLE VI - ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES ..................................................................... 21

ARTICLE VII - FEASIBILITY OF PLAN ................................................. 22

ARTICLE VIII - ALTERNATIVES TO DEBTOR'S PLAN ...................................... 22

ARTICLE IX - RISKS TO CREDITORS UNDER DEBTOR'S PLAN .................................. 22

ARTICLE X - TAX CONSEQUENCES TO THE DEBTOR.................................... 22

ARTICLE XI - PENDING LITIGATION................................................ 25

ARTICLE XII - SUMMARY OF SIGNIFICANT
ORDERS ENTERED DURING THE CASE ......................................................... 25

EXHIBITS ................................................................................
    Plan of Reorganization.......................................................... 1
    Income and Expense Statement 2012 -2014....................................... 2
    Cash-flow Budget ................................................................ 3
    Claims Summary and Plan Payment Schedule ............................................ 4

# ARTICLE I

## Identity of the Debtor

**1.01**    Debtor filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. Section 101, et seq. ("Code") on January 6, 2015 in the United States Bankruptcy Court for the Eastern District of Texas, Tyler Division ("Court"), initiating the above-styled and referenced bankruptcy proceeding. The Debtor is operating its business as a Debtor-in-Possession pursuant to Sections 1107 and 1108 of the Code.

### Purpose of This Disclosure; Source of Information

**1.02.**    Debtor submits this Disclosure Statement pursuant to Section 1125 of the Code to all known Claimants of Debtor for the purpose of disclosing that information which the Court has determined is material, important, and necessary for Creditors of, and the Members of, Debtor in order to arrive at an intelligent, reasonably informed decision in exercising the right to vote for acceptance or rejection of the Debtor's Plan.  A copy of the Plan is attached hereto as ***Exhibit "1"*** and incorporated herein by this reference. The Plan sets forth in detail the repayment arrangement between the Debtor and its creditors. This Disclosure describes the operations of the Debtor contemplated under the Plan.  Any accounting information contained herein has been provided by the Debtor and has been prepared using the cash method of accounting.

### Explanation of Chapter 11

**1.03**    Chapter 11 is the principal reorganization chapter of the Code.  Pursuant to Chapter 11, a debtor is authorized to reorganize its business for its own benefit and that of its creditors and equity interest holders.  Formulation of a plan of reorganization is the principal purpose of a Chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in the debtor.  After a plan of reorganization has been filed, it must be accepted by holders of claims against, or interests in, the debtor.  Section 1125 of the Code requires full disclosure before solicitation of acceptances of a plan of reorganization. This Disclosure is presented to Claimants to satisfy the requirements of Section 1125 of the Code.

### Explanation of the Process of Confirmation

**1.04**    Even if all Classes of Claims accept the plan, its confirmation may be refused by the Court.  Section 1129 of the Code sets forth the requirements for confirmation and, among other things, requires that a plan of reorganization be in the best interests of Claimants.  It generally requires that the value to be distributed to Claimants and Equity Interest Holders may not be less than such parties would receive if the debtor were liquidated under Chapter 7 of the Code.

**1.05**    Acceptance of the plan by the Creditors and Equity Interest Holders is important. In order for the plan to be accepted by each class of claims, the creditors that hold at least two thirds (2/3) in amount and more than one-half (½) in number of the allowed claims actually voting on the plan in such class must vote for the plan and the equity interest holders that hold at

least two-thirds (2/3) in amount of the allowed interests actually voting on the plan in such class must vote for the plan. Chapter 11 of the Code does not require that each holder of a claim against, or interest in, the debtor vote in favor of the plan in order for it to be confirmed by the Court. The plan, however, must be accepted by: (i) at least the holder of one (1) class of claims by a majority in number and two-thirds (2/3) in amount of those claims of such class actually voting; or (ii) at least the holders of one (1) class of allowed interests by two-thirds (2/3) in amount of the allowed interests of such class actually voting.

1.06    The Court may confirm the plan even though less than all of the classes of claims and interests accept it. The requirements for confirmation of a plan over the objection of one or more classes of claims or interests are set forth in Section 1129(b) of the Code.

1.07    Confirmation of the plan discharges the debtor from all of its pre-confirmation debts and liabilities except as expressly provided for in the plan and Section 1141(d) of the Code. Confirmation makes the plan binding upon the debtor and all claimants, equity interest holders and other parties-in-interest, regardless of whether or not they have accepted the plan.

### Voting Procedures

1.08    **Unimpaired Class**. Claimants in Class 1 are not impaired under the Plan. Such Class, therefore, is deemed to have accepted the Plan.

1.09    **Impaired Classes**. The Classes 2, 3, 4, 5, 6 and 7 Claimants are impaired as defined by Section 1124 of the Code. The Class 8 Insider Claims are impaired but as insiders their votes do not count towards Confirmation. The Debtor is seeking the acceptance of the Plan by Claimants in Classes 2, 3, 4, 5, 6 and 7. Each holder of an Allowed Claim in Classes 2, 3, 4, 5, 6 and 7 may vote on the Plan by completing, dating and signing the ballot sent to each holder and filing the ballot as set forth below. One ballot will be sent to each Claimant eligible to vote on the Plan. For all Classes, the ballot must be returned to Debtor's attorney, Arthur Ungerman, Attorney at Law, 12720 Hillcrest Road, Suite 625, Dallas, Texas 75230 by mail, email arthur@arthurungerman.com, or (972) 239-9886 by facsimile. In order to be counted, ballots must be **RECEIVED** no later than at the time and on the date stated on the ballot.

1.10    **Acceptances**. Ballots that are signed and returned but fail to indicate either an acceptance or rejection will not be counted.

### Best Interests of Creditors Test

1.11    Section 1129(a)(7) of the **Code** requires that each impaired class of claims or interests accept the **Plan** or receive or retain under the **Plan** on account of such claim or interest, property of a value as of the **Effective Date** of the **Plan**, that is not less than the amount that such holder would so receive or retain if the **Debtor** were liquidated under Chapter 7 of the Bankruptcy **Code**. If Section 1111(b)(2) of the **Code** applies to the claims of such class, each holder of a claim of such class will receive or retain under the **Plan**, on account of such claim, property of a value, as of the **Effective Date** of the **Plan**, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims. In order for the **Plan** to be confirmed, the **Court** must determine that the **Plan** is in the best interests of the **Debtor**'s creditors. Accordingly, the proposed plan must provide the **Debtor**'s creditors with

more than they would receive in a Chapter 7 liquidation. Accordingly, since the **Plan** proposes to pay all secured creditors in full and the unsecured creditors a substantial dividend, Debtor believes that the creditors are receiving more than they would receive in Chapter 7 liquidation. Accordingly, the **Plan** satisfies the requirements of Section 1129(a)(7).

### Cramdown

**1.12**   The **Court** may confirm the **Plan** even though less than all of the classes of claims and interests accept it. The requirements for confirmation of a plan over the objection of one or more classes of claims or interests are set forth in Section 1129(b) of the **Code**. Accordingly, **Debtor**, as the plan proponent, requests the **Court** to determine that the **Plan** does not discriminate unfairly, and is fair and equitable with respect to any objecting creditor. A discussion of the specific requirements for Cramdown of a Plan are set forth starting below.

### Definition of Impairment

**1.13**   As set forth in section 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired under a plan of reorganization unless, with respect to each claim or equity interest of such class, the plan:

(a)   leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity interest; or

(b)   notwithstanding any contractual provision or applicable law that entitles the holder or a claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default:

(i)   cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code;

(ii)   reinstates the maturity of such claim or interest as it existed before such default;

(iii)   compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

(iv)   does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

### Classification and Treatment of Claims and Interests

**1.14**   The Plan classifies Claims separately in accordance with the Bankruptcy Code and provides different treatment for different classes of Claims.

**1.15**   Only holders of Allowed Claims are entitled to receive distributions under the Plan. Allowed Claims are Claims that are not in dispute, are not contingent, are liquidated in amount, and are not subject to objection or estimation. Initial distributions or other transfers of Cash or other consideration specified in the Plan otherwise available to the holders of Allowed

Claims will be made on the Effective Date, or (b) the date on which such Claim becomes an Allowed Claim), as otherwise provided in the Plan, or as may be ordered by the Bankruptcy Court.

**1.16**    In accordance with the Plan, unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim under the Plan will be in full satisfaction, settlement, release, and discharge of and in exchange for each and every Claim.

### Requirements for Confirmation of the Plan

**1.17**    At the confirmation hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in section 1129 of the Bankruptcy Code, these requirements are as follows:

The plan complies with the applicable provisions of the Bankruptcy Code.

The proponents of the plan comply with the applicable provisions of the Bankruptcy Code.

The plan has been proposed in good faith and not by any means forbidden by law.

Any payment made or promised by the Debtor, by the plan proponents, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of the Bankruptcy Court as reasonable.

(A)    The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the plan; and (B) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and    the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider.

Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the Debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

With respect to each impaired class of claims or interests:

(i) each holder of a claim or interest of such class has (A) accepted the plan or (B) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code on such date; or (ii) if section 1111(b)(2) of the

Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.
With respect to each class of claims or interests:

(i)    such class has accepted the plan; or

(ii)    such class is not impaired under the plan.

Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(i)    with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(ii)    with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of the Bankruptcy Code, each holder of a claim of such class will receive: (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(iii)    with respect to a claim of a kind specified in section 507(a)(7) of the Bankruptcy Code, the holder of a claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class.

Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the plan, unless such liquidation or reorganization is proposed in the plan.
All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payments of all such fees on the effective date of the plan.

The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

The Debtor believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor has complied with or will have complied with all the requirements of chapter 11, and that the Plan is proposed in good faith. At the Confirmation Hearing, the Bankruptcy Court will determine whether holders of Allowed Claims or Allowed Equity Interests would receive greater distributions under the Plan than they would receive in a liquidation under chapter 7.

The Debtor believes that the feasibility requirement for confirmation of the Plan is satisfied by the fact that the future operating revenues will be sufficient to satisfy the obligations under the Plan in addition to supporting sustainable growth of the enterprise. These facts and others demonstrating the confirmability of the Plan will be shown at the Confirmation Hearing.

## Cramdown

**1.18**    The bankruptcy court may confirm a plan of reorganization even though fewer than all the classes of impaired claims and interests accept it. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or interests, the proponents of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

**1.19**    "Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims. As set forth in section 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

With respect to a class of **secured claims**, the plan provides:

(a)  (i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii)    that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)  for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)  the realization by such holders of the "indubitable equivalent" of such claims.

With respect to a class of **unsecured claims**, the plan provides:

(a)   that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b)   the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 subject to the requirements that a) the value, as of effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or (b) the value of property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

With respect to a class of **interests**, the plan provides:

(a)   that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest; or
(b)   that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

**1.20**   In the event that one or more classes of impaired Claims reject the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired class of Claims. SO LONG AS THE CLASSES OF UNSECURED CREDITORS VOTE FOR THE PLAN THEN THE PLAN WILL NOT VIOLATE THE ABSOLUTE PRIORITY RULE. The absolute priority rule requires that prior to the Debtor retaining or receiving any property the senior classes of claims must be paid in full or vote to accept the Plan.

The Debtor believes the Plan does not discriminate unfairly against, and is fair and equitable with respect to, each impaired class of Claims.

## II.

## REPRESENTATIONS

2.01   This Disclosure is provided pursuant to Section 1125 of the **Code** to all of the **Debtor's** known **Creditors** and other parties in interest in connection with the solicitation of acceptance of its **Plan** of reorganization, as amended or modified. The purpose of this Disclosure is to provide such information as will enable a hypothetical, reasonable investor, typical of the

holders of **Claims**, to make an informed judgment in exercising its rights either to accept or reject the **Plan**.

2.02    The information contained in this Disclosure has been derived from information submitted by the **Debtor**, unless specifically stated to be from other sources.

2.03    No representations concerning the **Debtor** are authorized by the **Debtor** other than those set forth in this Disclosure.  The **Debtor** recommends that any representation or inducement made to secure your acceptance or rejection of the **Plan** which is not contained in this Disclosure should not be relied upon by you in reaching your decision on how to vote on the **Plan**.  Any representation or inducement made to you not contained herein should be reported to the attorneys for **Debtor** who shall deliver such information to the **Court** for such action as may be appropriate.

2.04    ANY BENEFITS OFFERED TO THE CREDITORS ACCORDING TO THE PLAN WHICH MAY CONSTITUTE "SECURITIES" HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC"), THE TEXAS SECURITIES BOARD, OR ANY OTHER RELEVANT GOVERNMENTAL AUTHORITY IN ANY STATE OF THE UNITED STATES.  IN ADDITION, NEITHER THE SEC, NOR ANY OTHER GOVERNMENTAL AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATIONS TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

2.05    THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE.  THE APPROVAL BY THE COURT OF THIS DISCLOSURE DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN OR GUARANTEE THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

2.06    THE DEBTOR BELIEVES THAT THE PLAN WILL PROVIDE CLAIMANTS WITH AN OPPORTUNITY ULTIMATELY TO RECEIVE MORE THAN THEY WOULD RECEIVE IN A LIQUIDATION OF THE DEBTOR'S ASSETS, AND SHOULD BE ACCEPTED.  CONSEQUENTLY, THE DEBTOR URGES THAT CLAIMANTS VOTE FOR THE PLAN.

2.07    DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN.

## III.

## FINANCIAL PICTURE OF THE DEBTOR

**3.01   Financial History and Background of the Debtor.**

The Debtor purchased the Hotel on or about November 29, 2007 for $2,725,000.00. The hotel is a midsized property. For much of its history, the hotel operated as a Comfort Inn brand of the Choice Hotels International, Inc. Franchise ("Choice Hotels"). Fidelity Bank provided funding in the original principal amount of $1,384,606.00 ("Note 1") to the Debtor and the Central Mississippi Development Company, Inc. (hereinafter referred to as the "SBA") provided funding in the original principal amount of $993,000.00.

As of the Petition Date, there are seven (7) shareholders of the Debtor, namely Mahesh Patel 45%, Vimal Patel 10%, Dilip Patel 10%, Mehul Patel 10%, Manhar Patel 10%, Shilpa Patel 10%, and Sandip Desai 5%. Mahesh Patel, the managing member of the Debtor, has managed the Hotel for much of its history, and has experience in operating, renovating, and marketing midscale to upper midscale properties. The majority of the principals have been in the hotel industry for over 15 years and are experienced in managing properties ranging from economy, to upper midscale level properties. Vimal Patel currently manages the property. He is a graduate of Collins School of Hospitality Management. The institution educates its students to operate in positions at high-end hotels such as Hyatt, Hilton, Marriot, IHG, etc. Together Mahesh Patel and Vimal Patel oversee all aspects of the Debtor, including its assets, cost control, revenue management, franchise relations, sales and marketing, and the day-to-day operations of the Hotel. Prepetition payments to Debtor's insiders were to Mahesh Patel for management fees of $60,000.00 yearly and Vimal Patel was paid a salary of $55,000.00 annually for his role as general manager. No payments have been made to insiders since the Petition Date.

### Franchise change from Comfort Inn to Quality Inn

In 2010, the license to operate as a Comfort Inn terminated. The Debtor was unable to renew its license because of the renovations that the Hotel would have to make to the style and height of the Hotel to meet the new requirements of Comfort Inn. Seeking to remain in the Choice Hotels Franchise family, the Debtor converted its brand to a Quality Inn, which is a midscale franchise of Choice Hotels.

On or about April 12, 2011, Fidelity provided additional funding in the original principal amount of $200,000.00 ("Note 2)", to fund the property improvement plan required by Choice Hotels when the Debtor converted to Quality Inn. The SBA agreed to subordinate its second lien to Fidelity Bank, therefore Fidelity Bank holds the first and second lien on the Hotel.

The current balances due to the secured lenders are $1,359.335.95 to Fidelity Bank on Note 1; $197,142.59 on Note 2 and $891,480.60 to the SBA. The Debtor owes approximately $36,496.97 in property taxes. This brings the total secured debt on the property as of the Petition

Date to $2,484,460.11.  The Debtor reserves its rights to amend the figures after reviewing proofs of claims filed by each of the secured creditors.

## Factors Reducing Revenue

The Debtor initially enjoyed reduced franchise rates with Quality Inn, through an incentive program which began in 2011.  The Debtor saved 4.65% in royalty fees charged by Choice Hotels.  However, the program ended in 2012 and the royalty fees were reinstated, resulting in additional expenses from 2012 to present.  Further, the Debtor's debt service increased an additional $1,400.00 per month because of Fidelity's Note 2 to fund the property improvement plan.

In addition to the added expenses from the property improvement loan and royalty fees being reinstated, the Debtor's revenues were negatively affected due to several factors in the market.  The previous owner of the Hotel, from which the Debtor purchased the Hotel, purchased another property, the Crossroads Inn across the street, less than a quarter mile from the Debtor sometime in 2010.  The previous owner leveraged his knowledge of the market and the Debtor's direct client base to aggressively target the Debtor's client base. This led to Debtor losing some of its clientele to the previous owner.

In 2013, the Crossroads Inn went under new management and was upgraded and renovated to a midscale/economy hotel and the name was changed to Corinth Inn and Suites. This became immediate competition for Debtor as both hotels were now in the midscale/ economy market.

The seasonality of the hotel business is also a factor accounting for declined revenues. Debtor saw a reduction in sales in fall and winter months. The months of August to December grossed $177,466.00 less cumulatively in 2013 and 2014, than it had done in 2012.  The reduction in sales during the fall and winter months, affected other hotels in Corinth as well.

The Corinth hotel market thrives on its interstate transient business, revenue from local companies, construction crews, and various groups.  Located on the intersection of I-45 and Highway 72, the property is visible to both highways and receives quite a bit of transient clientele.  In 2013 and 2014, the market as a whole saw less transient business.  Less groups were coming to the Corinth market.  The arena in Corinth facilitates many large events such as concerts, monster truck rallies, etc.  Debtor saw less of this in 2013 and 2014.  There were other groups that Debtor and the hotel market in Corinth did not see which included family reunions, high school sports teams, construction crews, and factory shut down crews.  The absence of these groups hurt revenues substantially.

**Expenses:**    The Debtor's proposed reorganization expenses are well within the industry trends for a comparable property of its size and brand.  A Property Improvement Plan ("PIP") required by Choice Hotels is due and will cost $250,000.00 to complete.  The Debtor will borrow funds to complete the required improvements.  The Debtor's cash flow as set forth on **Exhibit "3"** shows funds on hand will be available to service the financing required to complete the improvements.  This will be obtained by reducing salaries and fees to the Debtor's insiders Mahesh Patel and Vimal Patel so that the Debtor can make the Plan payments and

generate an additional $60,000.00 yearly ($300,000.00 at the end of five years) to pay the financing for the PIP.

Mahesh Patel and Vimal Patel will reduce their salaries to $30,000 a year for each. The management fees and salaries paid to the insiders are reasonable for the work done by the insiders in managing the Debtor's affairs, and necessary to secure the performance of the services, and are less than the cost of management fees and salaries for a hotel of this size and in the Corinth market.

**Reorganization Goals**: The key problems with the hotel are all directly related to the drastic downturn in the economy, competition and its downward effect on occupancy rates, room revenue and pricing. The Debtor continues to use very aggressive marketing to increase its revenue share. Within two and a half years, new business will reopen in the area. New businesses have already opened. The Debtor's managers continue to reduce and streamline operating expenses, without sacrificing the quality of service to the hotel guests. The Debtor believes that it is strongly positioned to meet its obligations under the Plan, and also complete its property improvements while maintaining the Hotel operations.

### Current Operations

3.02.   An Income and Expense statement showing the Debtor's actual operations for the time period 2012 - 2014 is attached hereto as **_Exhibit "2"_** and incorporated herein by this reference as if set forth in full for all purposes.

### Future Income and Expenses Under the Plan

3.03.   The Debtor's Cash Flow Budget setting forth projections of funds available to make its plan payments is set forth on **_Exhibit "3"_** attached hereto. The Debtor's Claims Summary and Plan Payment Schedule is attached hereto as **_Exhibit "4"_**. The Debtor will fund the Plan from its continued business operations and the capital contribution from the proposed new shareholders Mahesh Patel and Vimal Patel in the amount of $26,000.00. Further, Mahesh Patel and Vimal Patel, have agreed to reduce their respective management fees and salaries so that the Debtor can make the Plan payments and contribute to pay the financing for the PIP.

### Future Management of the Debtor

3.04.   The **Plan** contemplates Vimal Patel and Mahesh Patel will continue the management and operation of the Debtor's business. Mahesh Patel and Vimal Patel will receive $30,000.00 each annually. The management fees and salaries paid to the insiders are reasonable for the work done by the insiders in managing the Debtor's affairs, and necessary to secure the performance of the services, and are less than the cost of management fees and salaries for a hotel of this size and in the Corinth market.

## IV.

## ANALYSIS AND VALUATION OF PROPERTY

### Real Property

4.01.    The **Debtor** owns the real property located at 3501 Hwy 259 North, Kilgore, TX 75662. The total value of such property is $1,620,020.00. The Debtor's opinion of value is based on the 2014 Alcorn County Appraisal District's appraisal value of 1,620,020.00 for the land and improvements, taking into account the age and condition of the property, the comparatives or newer modeled properties in close proximity to the Debtor and the required improvements to the property to meet the franchise requirements.

### Personal Property

4.02.    The **Debtor** owns the personal property described as follows:

| Property | Value |
|---|---|
| Bank Accounts | $6,418.86 |
| Accounts Receivable | $21,078.87 |
| Office Equipment, Furnishing and Office Supplies | $2,425.00 |
| Machinery and Equipment | $36,375.00 |
| Inventory | $3,100.00 |

The Debtor does not have a current appraisal on the personal property but its opinion of value is $69,397.73. The Debtor values the personal property based on its age, condition and need for upgrade. If forced to liquidate in a rapid fashion, only about 50% of the personal property's actual value would be realized.

### Liquidation Value of Assets

| Property | Value | Secured Debt | Equity |
|---|---|---|---|
| Real Property | $1,620,020.00 | $2,484,460.11 | $0.00 |
| Personal Property | $69,397.73 | $2,484,460.11 | $0.00 |

The projected amount of unsecured debt is $831,054.22 and these claims will be paid 5% over five (5) years for a total of $41,552.71. The Debtor has prepared this Liquidation Analysis based on its opinion of the value of the assets. It has not included costs of sale which would be approximately 8%. Funding for the Plan will come from the sale of stock for $26,000.00 and the Debtor's business operations and income. The Debtor will pay for the financing costs of the property improvement plan by reducing the salaries and management fees to insiders Mahesh Patel and Vimal Patel, as discussed above. The Debtor's property is subject to the liens of City of

Corinth $24,937.32; Alcorn County, $11,559.65, Gregg County has filed a proof of claim for $22,108.18, but such claim is disputed, Fidelity Bank's 1st lien of $1,359,335.95 and second lien of $197,142.59 and the SBA for $891,480.60.

**V.**

## SUMMARY OF THE PLAN

**Class 1** consists of any Allowed Administrative Claims.

**Class 2** consists of any Allowed Secured Property Tax Claims.

**Class 3** consists of any Allowed Priority Tax Claims.

**Class 4** consists of the Allowed Secured Claim of Fidelity Bank Note 1.

**Class 5** consists of the Allowed Secured Claim of Fidelity Bank Note 2.

**Class 6** consists of the Secured Claim of the SBA.

**Class 7** consists of the General Unsecured Claims

**Class 8** consists of the Shareholder Interests.

**5.01    Class 1 Claims**. The Class 1 Claims will be paid once Allowed in full by the Debtor, on the Effective Date or as otherwise agreed to by the Claimants in this Class. These claims are priority claims pursuant to Section 507(a) of the Bankruptcy Code. These claims include claims for Choice Hotels ($25,347.23), Debtor's attorney's fees, and U.S. Trustee's fees. U.S. Trustee's fees must be paid until the case is closed. The Debtor shall file quarterly reports following confirmation and until the case is closed. The Class 1 Claims may agree to a different treatment. The executory contract between Debtor and Choice Hotels shall be assumed, as of the Effective Date. As a condition to the assumption of the Franchise Agreement, (a) on the Effective Date, the Debtor will pay to Choice Hotels all of the pre-petition unpaid franchise fees in the amount of $25,347.23 and (b) the Debtor will secure funding to pay the PIP on terms approved by Choice Hotels to complete the obligations under the PIP by December 31, 2018.

**5.02.    Class 2 Claims**. The Class 2 Claims consist of the claims of City of Corinth $24,937.32; Alcorn County $11,559.65 and Gregg County $22,018.18. The claim of Gregg County is disputed and not scheduled to be paid under the Plan, in the absence of an order from the Bankruptcy Court allowing such claim.

The Class 2 Claims are secured claims with liens that will follow the collateral securing such claims and to the extent that such collateral is surrendered either prior to or as part of this Plan such secured liens and claims shall follow the collateral and shall not be paid by the Debtor as part of this Plan. The Class 2 Allowed Claims that relate to collateral or property being retained by the Debtor as part of the Plan shall be paid once Allowed over sixty (60) months from the Petition Date with interest on such amounts at the rate of 12% per annum until paid in full. The payments shall be made to the extent of pre-petition tax escrow on hand (if any) and

then monthly payments on the unpaid balance shall be made in equal monthly payments on the Effective Date and shall continue on the first day of each month thereafter until paid in full.

The Class 2 Claims shall accrue interest from the Petition Date at the rate of 1% per month from the Petition Date through the Effective Date of the Plan and 12% per annum following the Effective Date until paid in full. These creditors shall retain their senior liens to secure their claims until paid in full under this Plan. In the event that the Debtor disputes such claim, the payments will be applied to the undisputed amount of the claim as ultimately allowed. While resolution of any such objection is pending, payments pursuant to the Plan shall be applied to the undisputed portion of the claim as ultimately allowed. In the event of a default under the plan, counsel for holder of a claim in this class shall provide written notice of the default to the Debtor at 3501 Hwy 259 North Kilgore, TX 75662 with a copy to counsel for the Debtor at 12720 Hillcrest Road, Suite 625, Dallas, Texas 75230. Such default shall be cured within 15 business days of the date of transmission of such notice of default. In the event the default is not cured, the claimant shall be entitled to pursue all amounts owed pursuant to state law outside of the Bankruptcy Court. The claimants shall only be required to provide two notices of default. Upon a third event of default, the claimant shall be entitled to collect all amounts owed pursuant to state law outside of the Bankruptcy Court without further notice. Failure to pay post-petition taxes prior to delinquency shall constitute an event of default.

The Class 2 Claims are Impaired and the holders of the Class 2 Claims are entitled to vote to accept or reject the Plan.

**5.03.** **Class 3 Claims.** The Class 3 Priority Claims will be paid as Allowed as follows:

These claims will be paid in equal monthly payments over five (5) years from the Petition Date with interest on such amounts at the rate of 4.5% per annum from the Effective Date until paid in full. These claims are priority claims. A failure by the Reorganized Debtor to make a payment to the priority tax creditors pursuant to the terms of the Plan shall be an Event of Default. If the Reorganized Debtor fails to cure and Event of Default as to such payments within ten (10) days after receipt of written notice of default from the priority tax creditors, then the priority tax creditors may (a) enforce the entire amount of its claim; (b) exercise any and all rights and remedies the priority tax creditors may have under applicable state law; and/or (c) seek such relief as may be appropriate in the Court. In the event of a default under the plan, counsel for holder of a claim in this class shall provide written notice of the default to the Debtor at 3501 Hwy 259 North Kilgore, TX 75662 with a copy to counsel for the Debtor at 12720 Hillcrest Road, Suite 625, Dallas, Texas 75230. The claimants shall only be required to provide two notices of default. Upon a third event of default, the claimant shall be entitled to collect all amounts owed pursuant to state law outside of the Bankruptcy Court without further notice.

The Class 3 Claims consist of:

| | |
|---|---|
| Misssissippi State Sales Tax | $5,537.00 |
| City of Corinth Sales Tax | $1,852.02 |
| Alcorn County Tax collector office | $927.38 |
| Employment Security Commission | $183.55 |

| Mississippi State Payroll tax | $378.00 |
|---|---|
| IRS | $2,041.86 |

The Class 3 Claims are Impaired and the holders of the Class 3 Claims are entitled to vote to accept or reject the Plan.

**5.04.   Class 4 Claim.** The Class 4 Claim will be paid as Allowed as follows:

The Class 4 Claim is the Allowed Secured Claim of Fidelity Bank for Promissory Note and Loan and Security Agreement, and other documents executed therewith (collectively the "Loan Documents"), executed by Debtor in favor of Fidelity or about November 29, 2007 in the original principal amount of $1,384,606.00 ("Note 1").

Note 1 shall be allowed in the amount of $1,359,339.95 ("Allowed Secured Claim"). The Allowed Secured Claim shall be paid in full on or before November 29, 2032. Payment on the Allowed Secured Claim shall be based on a 25 year amortization period at a fixed interest rate of four and eighty-six percent (4.86%) paid in equal monthly installments beginning on the Effective Date and continuing on the first day of each month thereafter until November 29, 2032, at which time a final payment will be due consisting of all unpaid principal and interest on the Allowed Secured Claim.

The Allowed Secured Claim shall bear interest per annum at a fixed interest rate of 4.86% for 60 months beginning on the Effective Date of the Plan. The interest rate shall adjust every 60 months following the Effective Date. The adjusted interest rate shall be equal to the five (5) year Seattle Federal Home Loan Long Term, Fixed Advanced Bullet Rate plus three and 75/100ths percent (3.75%). The adjusted interest rate shall be the rate in effect on the last business day immediately preceding the expiration of the 60 month period.

The Allowed Secured Claim shall be reduced by payments made to Fidelity Bank during the Bankruptcy proceeding and those amounts shall be credited as principal reduction on the Allowed Secured Claim.

The unmodified terms of Fidelity Bank's pre-petition Loan Documents are not modified by the Plan or Confirmation Order unless specifically stated in the Plan. Fidelity Bank shall retain all of its liens and security interests as originally provided in its Loan Documents until paid in full pursuant to the terms of the Plan, at which time it shall release its liens on the Debtor's property. The Plan terms will control over contradictory terms in the Loan Documents and to the extent a term is not modified in the Loan Documents it will remain in effect.

The Class 4 Claim is Impaired and the holder of the Class 4 Claim is entitled to vote to accept or reject the Plan

**5.05.   Class 5 Claim.** The Class 5 Claim will be paid as Allowed as follows:

The Class 5 Claim is the Allowed Secured Claim of Fidelity Bank for the Promissory Note, Loan Agreement and Security Agreement and other documents executed therewith

(collectively the "Loan Documents"), executed by Debtor in favor of Fidelity Bank dated April 12, 2011, in the original principal amount of $200,000.00 ("Note 2"). Note 2 shall be allowed in the amount of $197,142.59 ("Allowed Secured Claim") and shall be paid in full on or before November 29, 2032.

The Allowed Secured Claim shall bear interest per annum at a fixed interest rate of six and sixty-three percent (6.63%) through April 12, 2016 at which time the interest rate may change as set forth in the Loan Documents between the Debtor and Fidelity Bank.

Payments on the Allowed Secured Claim shall be calculated based on a 25 year amortization period at the initial interest rate of 6.63%. After April 12, 2016, payments shall be calculated based on a 25 year amortization period along with the applicable adjusted interest rate. Payments shall begin on the Effective Date and shall be paid in equal monthly installments beginning on the Effective Date and continuing on the first day of each month thereafter until November 29, 2032, at which time a final payment will be due consisting of all unpaid principal and interest on the Allowed Secured Claim.

The Allowed Secured Claim shall be reduced by payments made to Fidelity Bank during the Bankruptcy proceeding and those amounts shall be credited as principal reduction on the Allowed Secured Claim.

The unmodified terms of Fidelity Bank's Loan documents are not modified by the Plan or Confirmation Order unless specifically stated in the Plan. Fidelity Bank shall retain all of its liens and security interests as originally provided in its Loan Documents until paid in full pursuant to the terms of the Plan, after which time it shall release its liens on the Debtor's property. The Plan terms will control over contradictory terms in the Loan Documents and to the extent a term is not modified in the Loan Documents it will remain in effect.

The Class 5 Claim is Impaired and the holder of the Class 5 Claim is entitled to vote to accept or reject the Plan.

**5.06.  Class 6 Claims.** The Class 6 Claim is the Allowed Secured Claim of the SBA and will be paid as Allowed as follows:

The Class 6 Claim is the Allowed Secured Claim of the SBA and shall be allowed in the amount of $100,000.00 ("Allowed Secured Claim"). The Claim shall be paid in full over five years with interest on such Allowed Secured Claim at the rate of five percent (5%), amortized over 25 years. The payments shall be made in equal monthly payments beginning on the Effective Date and shall continue on the first day of each month thereafter until paid in full.

The Class 6 Claim is Impaired and the holder of the Class 6 Claim is entitled to vote to accept or reject the Plan. The SBA shall retain all of its liens and security interests as originally provided in its Loan Documents until paid as set forth in this Class 6, after which time it shall release its liens on the Debtor's property.

**5.07.  Class 7 Claims.** The Class 7 Claims will be paid as Allowed as follows:

The Class 7 Claims as Allowed General Unsecured Claims shall be paid once Allowed at 5% of their claims over five (5) years. The payments shall be made in equal monthly payments on the Effective Date and shall continue on the first day of each month thereafter until 5% of their claims are paid.

The holders of the Class 7 Claims are:

| Claimant | Claim Amount | Amount Paid in Plan |
|---|---|---|
| IRS | 2,865.41 | 143.27 |
| Royal Cup | 2,863.39 | 143.17 |
| Alcorn County Electric | 3,025.52 | 151.28 |
| Alcorn County Electric | 860.98 | 43.05 |
| AT&T Global | 49.86 | 2.49 |
| AT&T Global | 1,547.92 | 77.40 |
| AT&T Global | 160.60 | 8.03 |
| Booking.com | 199.33 | 9.97 |
| Carbon Golden Malted | 435 | 21.75 |
| Comcast Cable | 6,248.02 | 312.40 |
| Comcast Cable | 203.90 | 10.20 |
| Comcast Cable | 102.90 | 5.15 |
| Corinth Water & Gas | 1,133.65 | 56.68 |
| Corinth Water & Gas | 77.90 | 3.90 |
| Corinth Water & Gas | 2,241.00 | 112.05 |
| Ecolab | 1,150.99 | 57.55 |
| Gold Bond Pest Control, LLC | 1,318.24 | 65.91 |
| Handy-Man Rentals, Inc. | 75.11 | 3.76 |
| Hardwick and Company, PA | 534.49 | 26.72 |
| HD Supply | 2,480.06 | 124.00 |
| Magnolia Regional Health Care Center | 570.00 | 28.50 |
| Maintenance USA | 522.89 | 26.14 |
| MS Logo | 800.00 | 40.00 |
| My Eres | 411.40 | 20.57 |
| Orkin Pest Control | 1,074.97 | 53.75 |
| Royal Cup Coffee | 3,882.57 | 194.13 |
| S&D Coffee | 2,342.60 | 117.13 |
| Sysco Guest Supply | 2,206.59 | 110.33 |
| SBA | 791,480.60 | 44,574.03 |
| Vingcard Elsafe/Assa Abloy Hospitality | 188.33 | 9.42 |
| **TOTAL** | **831,054.22** | **46,552.71** |

The Class 7 Claims are Impaired and the holders of the Class 7 Claims are entitled to vote to accept or reject the Plan.

**5.08.   Class 8 Equity Interest Holders.** The Class 8 Equity Interest Holders will be treated as follows:

On the Effective Date, all equity interests shall be cancelled. The new equity interests in the Debtor shall be issued as follows:

| Vimal Patel | 55% |
| Shilpa Patel | 10% |
| Mehul Patel | 20% |
| Manhar Patel | 10% |
| Sandip Desai | 5% |

The new shareholders are contributing to the Debtor $26,000.00 total. These funds shall be deposited into the Debtor's counsel's trust account prior to the Confirmation Date. If the Plan is not Confirmed, the $26,000.00 will be returned to the proposed new shareholders in their respective shares.

The Debtor believes that the Plan will not violate the absolute priority rule and will be consensual as to the unsecured creditors. In the event that the unsecured creditors do not vote for the Plan, and the Bankruptcy Court requires an auction, to avoid an absolute priority issue then: (i) the existing shareholder interests will be cancelled on the Effective Date, (ii) the new equity interests in the Debtor shall be sold at an Auction sale as set forth herein, and (iii) the new equity interests in the Debtor shall be issued to the successful bidder for the interest in the Debtor at the Auction, subject to the terms of this Plan. If the Plan is not confirmed by the Court at the Confirmation Hearing, then the sale of the equity interests shall not proceed and the sale shall be cancelled. The Debtor shall remain the same corporate entity, without change in its structure.

The auction (the "Auction") under the Plan shall be held at the Confirmation Hearing. The auction procedure is that any person or entity that desires to be considered for a possible bid must serve on counsel for the Debtor, Choice Hotels and Fidelity Bank at least fourteen (14) business days prior to the Confirmation Hearing the following bid and supporting information (collectively, a "Bid") (i) a copy of its proposed bid containing the cash purchase price for the equity interests in Debtor, and all terms and conditions of the Bid, (ii) information identifying the proposed purchaser and all persons or entities who will own or control the proposed purchaser, (iii) information identifying the financial ability of the proposed purchaser and all persons or entities who will own or control the proposed purchaser to perform the Plan, (iv) information identifying the relevant experience and management of the proposed purchaser and all persons or entities who will own or control the proposed purchaser to perform the Plan, (v) an agreement by the proposed purchaser, and all persons who own or control the proposed purchaser, to execute at closing, a purchaser guaranty, in a form acceptable to Fidelity Bank. The Debtor, Choice Hotels,

Fidelity Bank and any other party- in- interest will provide notice of the bids received three (3) business days after receipt of the Bids and any objections to the Bids must be filed at minimum three (3) business prior to confirmation and ruled upon by the court.

If an Auction proceeds, the new equity interests in Debtor shall be sold for the highest and best bid, consistent with the terms of the Plan and subject to objections by creditors and parties-in- interest. A combined opening bid at an Auction sale is $26,000.00 for 100 percent of the new equity interests. Any Bid by another person or entity must exceed $26,000.00 by at least $10,000 and must provide for a full and unconditional guaranty of payment and performance of the obligations due to Choice Hotel and Fidelity Bank and the property tax creditors as provided above, by the proposed purchaser and all of its insiders or controlling persons, all in form and substance acceptable to Choice Hotel and Fidelity Bank. After consulting with Choice Hotel and Fidelity Bank, the Debtor can propose to take the highest and best cash offer for the purchase of the new equity interests in the Debtor at the time of the hearing on Confirmation, so long as the cash purchase price exceeds $26,000.00 and provides the required guaranty and assumption agreement acceptable to Choice Hotel and Fidelity Bank and provided that all creditors and parties-in- interest may object to any Bid and the proposed sale to a proposed purchaser. Even if a person or entity other than the proposed shareholders are the successful bidders for the new membership interests in Debtor under this Plan, the Plan and the rights and treatment of creditors and claims under the Plan are not impaired, changed or affected. Any winning bidder for the new equity interests in the Debtor acquires such new equity interests subject to (and must expressly assume): (i) the Plan, (ii) the Debtor's duties and obligations under the Plan, Fidelity Bank's loan documents, (iii) the allowance and treatment of claims, rights and liens under the Plan and the rights and remedies of creditors under the Plan, including payment of Fidelity Bank's Allowed Secured Claim and the obligations of the Debtor and the purchaser at the Closing. The Debtor shall solicit such bids by noticing this Plan out to the creditors in this case. The equity interest holders are impaired under the Plan. If the successful purchaser at the Auction is other than the proposed shareholders, then the successful purchaser and all persons who own or control the proposed purchaser, shall execute and deliver a purchaser guaranty in favor of Fidelity Bank.

## VI.

## ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

**6.01**  Debtor shall assume, pursuant to Bankruptcy Code Section 1123(b)(2), by separate Motions and order unexpired leases of non-residential real property and executory contracts prior to the Confirmation Date or as part of Confirmation of a Plan in this case, except that the executory contract between Debtor and Choice Hotel shall be assumed, effective as of the Effective Date. As a condition to the assumption of the Franchise Agreement, (a) on the Effective Date, the Debtor will pay to Choice Hotels all of the pre-petition unpaid franchise fees in the amount of $25,347.23 and (b) the Debtor will secure funding to pay the PIP on terms approved by Choice Hotels to complete the obligations under the PIP by December 31, 2018.

## VII.

## FEASIBILITY OF PLAN

**7.01**    Debtor asserts that this plan is feasible based on **Exhibits 2, 3 and 4**.

### Procedure for Filing Proofs of Claims and Proofs of Interests

**7.02.**    All proofs of claims and proofs of interests must be filed by those Claimants and Equity Interest Holders who have not filed such instruments on or before the Bar Date fixed by the Court.

**7.03.**    If Claimants have already filed a proof of claim with the Court or are listed in the Debtor's Schedules as holding non-contingent, liquidated and undisputed claims, a proof of claim need not be filed.  The schedules and amendments thereto are on file with the Court and are open for inspection during regular Court hours.  If the equity security interest of an Equity Interest Holder is properly reflected in the Debtor, a proof of interest need not be filed.

## VIII.

## ALTERNATIVES TO DEBTOR'S PLAN

**8.01**    If the Debtor's Plan is not confirmed, the Debtor's bankruptcy case may be converted to a case under Chapter 7 of the Code, in which case a trustee would be appointed to liquidate the assets of the Debtor for distribution to its Creditors in accordance with the priorities of the Code.  Since the Debtor's assets are heavily mortgaged Debtor projects that there would be little or no distribution to creditors in Chapter 7.

## IX.

## RISKS TO CREDITORS UNDER THE DEBTOR'S PLAN

**9.01**    Claimants should be aware that there are a number of substantial risks involved in consummation of the Plan.  The Plan contemplates that the Debtor's business will generate revenue sufficient to pay the obligations accruing from its operations.  The Debtor does not "guarantee" that the expenses will equal those in the projections; however, the Debtor believes that the projections are reasonable.

## X.

## TAX CONSEQUENCES TO THE DEBTOR

TO ENSURE COMPLIANCE WITH U.S. TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF UNITED STATES FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, BY HOLDERS OF CLAIMS OR INTERESTS OR ANY OTHER PERSONS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON

HOLDERS OF CLAIMS OR ANY OTHER PERSONS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF U.S. TREASURY DEPARTMENT CIRCULAR 230) OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.

A. Introduction

The following discussion summarizes certain material U.S. federal income tax consequences of the Plan to the Debtor and holders of Claims and Interests. The summary is provided for general informational purposes only and is based on the United States Internal Revenue Code of 1986, as amended (the "Tax Code"), the treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof (except as otherwise noted below with regard to the American Recovery and Reinvestment Act of 2009), and all of which are subject to change, possibly with retroactive effect. Changes in any of these authorities or in their interpretation could cause the United States federal income tax consequences of the Plan to differ materially from the consequences described below. The United States federal income tax consequences of the Plan are complex and in important respects uncertain. No ruling has been requested from the Internal Revenue Service (the "Service"); no opinion has been requested from Debtor's counsel concerning any tax consequence of the Plan; and no tax opinion is given by this Disclosure Statement.

The following discussion does not address all aspects of federal income taxation that may be relevant to a particular holder of a Claim or Interest in light of its particular facts and circumstances or to particular types of holders of Claims subject to special treatment under the Tax Code. For example, the discussion does not address issues of concern to broker-dealers or other dealers in securities, or foreign (non-U.S.) persons, nor does it address any aspects of state, local, or foreign (non-U.S.) taxation, or the taxation of holders of Interests in a Debtor. In addition, a substantial amount of time may elapse between the Confirmation Date and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the federal income tax consequences of the Plan and the transactions contemplated hereunder.

**On February 13, 2009, the House of Representatives and the Senate passed H.R.1, the American Recovery and Reinvestment Act of 2009 (the Recovery Act), a stimulus bill that includes tax breaks for businesses and individuals. The President signed the Recovery Act on February 17, 2009. The following discussion does not address any aspects of the Recovery Act, some of which may be relevant to a particular holder of a Claim or an Interest.**

**THE DISCUSSION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. EACH**

**HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH ITS TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

B. Certain Definitions

Except as expressly otherwise provided or unless the context otherwise requires, all capitalized terms not otherwise defined herein or in the Plan shall have the respective meanings assigned to them in this Article.

"*COD*" shall mean cancellation of indebtedness income.
"*NOL*" shall mean net operating loss.

C. Certain Material Federal Income Tax Consequences to the Debtor

Cancellation of a Debtor's debt is generally taxable income to the Debtor. COD is the amount by which the indebtedness of a Debtor discharged exceeds any consideration given in exchange therefore. Cancellation of a debt may not necessarily be COD, however. To the extent that the Debtor is insolvent, or if the Debtor is in bankruptcy, as is the case here, the Tax Code permits the Debtor to exclude the COD from its gross income. The statutory exclusion for COD in a title 11 case generally excludes COD from gross income if the discharge is granted by a court to a Debtor under its jurisdiction in a title 11 case, as is sought herein.

The price for the bankruptcy COD exclusion (as well as the insolvency exclusion) is reduction of the Debtor's tax attributes to the extent of the COD income, generally in the following order: NOLs for the year of the discharge and NOL carryovers from prior years; general business tax credit carryovers; minimum tax credit available as of the beginning of the year following the year of discharge; net capital loss for the year of discharge and capital loss carryovers from prior years; basis of the Debtor's assets; passive activity loss and credit carryovers from the year of discharge; and foreign tax credit carryovers to or from the year of discharge. The reduction of attributes does not occur until after the end of the Debtor's tax year in which the COD occurred, so they are available to the Debtor in determining the amount of its income, loss and tax liability for the year of discharge.

As a result of the implementation of the Plan, the Debtors will have COD and potential attribute reduction. Because any reduction in tax attributes does not effectively occur until the first day of the taxable year following the taxable year in which the COD is incurred, the resulting COD, on its own, should not impair the ability of the Debtor to use their tax attributes (to the extent otherwise available) to reduce their tax liability, if any, otherwise resulting from the implementation of the Plan.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership shift," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.   Although the Plan allows for an ownership change it is doubtful that one will occur and as such any owner of the Debtor should consult his own tax adviser concerning the effect of the Plan.

The United States federal income tax consequences of payment of Allowed Claims pursuant to the Plan will depend on, among other things, the consideration received, or deemed to have been received, by the holder of the Allowed Claim, whether such holder reports income on the accrual or cash method, whether such holder receives distributions under the Plan in more than one taxable year, whether such holder's Claim is allowed or disputed at the Effective Date, whether such holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

In general, a holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the amount of such holder's basis in its Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount. If the holder realizes a capital loss, its deduction of the loss may be subject to limitations under the Tax Code. The holder's aggregate tax basis for any property received under the Plan generally will equal the amount realized. The amount realized by a holder generally will equal the sum of the cash and the fair market value of any other property received (or deemed received) by the holder under the Plan on the Effective Date and/or any subsequent distribution date, less the amount (if any) allocable to Claims for interest. All holders of Allowed Claims are urged to consult their tax advisors. A holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of Section 453B of the Tax Code.

D. Importance of Obtaining Professional Tax Assistance

The foregoing discussion is intended only as a summary of certain U.S. federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax professional. The above discussion is for general information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a holder's individual circumstances.

HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

## XI.
## PENDING LITIGATION

**11.01.**    As of the date of the filing of the following matters are pending: Hearings on Fidelity Bank's Motion to Transfer Venue and Motion to Lift the Automatic Stay and the Debtor's Motion to Use Cash Collateral are set for March 17, 2015 at 1:30 p.m.

## XII.

## SUMMARY OF SIGNIFICANT ORDERS ENTERED DURING THE CASE

**12.01.**   As of the date of the filing of this Disclosure the following significant orders have been entered in this case:  Third Interim Order Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; and Order on Debtor's Application to Employ Counsel.

Respectfully submitted,

/s/  Arthur Ungerman
ARTHUR UNGERMAN
Attorney at Law
12720 Hillcrest Road
Suite 625
Dallas, Texas 75230
(972) 239-9055 Telephone
(972) 239-9886 Facsimile
COUNSEL FOR THE DEBTOR

/s/ Mahesh Patel
Mahesh Patel
Managing Member of the Debtor
MMD Hotel Corinth, LLC

# EXHIBIT "1"

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MMD HOTEL CORINTH, LLC | § | CASE NO: 15-60013-11 |
| | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |

## PLAN OF REORGANIZATION
## DATED MARCH 9, 2015

    **MMD HOTEL CORINTH, LLC** (the "Debtor"), proposes the following Plan of Reorganization Dated March 9, 2015 pursuant to Chapter 11 of the United States Bankruptcy Code on behalf of the Debtor. The Debtor's profitability to fund its Plan is from the Debtor's continued business operations and the contributions from the proposed new shareholders called for by the Plan.

## <u>TABLE OF CONTENTS</u>

ARTICLE I - DEFINITIONS AND USE OF TERMS ................................................... 3

ARTICLE II - CONCEPT OF THE PLAN .......................................................... 7

ARTICLE III - GENERAL TERMS AND CONDITIONS .......................................... 7

ARTICLE IV - DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS .................... 8

ARTICLE V- PROVISIONS FOR SATISFACTION OF CLAIMS AND INTERESTS ............ 8

ARTICLE VI - MEANS FOR IMPLEMENTATION OF PLAN ............................................ 15

ARTICLE VII - TREATMENT OF EXECUTORY CONTRACTS

AND UNEXPIRED LEASES ...................................................................... 16

ARTICLE VIII - PROVISIONS FOR THE RETENTION, ENFORCEMENT,

SETTLEMENT OR ADJUSTMENT OF CLAIMS BELONGING TO THE DEBTOR

AND THE ESTATE INCLUDING PREFERENCES AND CONVEYANCES ........................ 16

ARTICLE IX - EFFECT OF CONFIRMATION ....................................................... 17

ARTICLE X - MISCELLANEOUS PROVISIONS .................................................... 18

ARTICLE XI - MODIFICATION OF THE PLAN .................................................... 20

ARTICLE XII - RETENTION OF JURISDICTION .................................................. 20

## ARTICLE I

Page **2** of **22**

## DEFINITIONS AND USE OF TERMS

**1.01**        **Defined Terms**.  Unless the context otherwise requires, capitalized terms shall have the meanings set forth in this section 1.01.

**1.01.01**        **Administrative Claim or Expense** means an administrative expense or Claim described in Section 503 of the Bankruptcy Code and entitled to administrative priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, but not limited to, Claims for compensation of professionals made pursuant to Sections 330 and 331 of the Bankruptcy Code, and all fees and charges assessed against the Debtor and Debtor's property under 28 U.S.C. Section 1930.

**1.01.02**        **Administrative Tax Claim** means an Unsecured Claim by any governmental unit for taxes (including interest or penalties related to such taxes) for any tax year or period, all or a portion of which occurs or falls within the period from and including the Petition Date through the Effective Date.

**1.01.03**        **Allowed Claim** means a Claim against the Debtor allowable under the Bankruptcy Code to the extent that (I) a proof of Claim, proof of Interest, or request for payment was timely Filed or, with leave of the Bankruptcy Court, late Filed, and as to which no objection has been timely Filed or, if Filed, is allowed by a Final Order, unless otherwise provided in this Plan or (ii) the Claim is scheduled and not listed as disputed, contingent, or unliquidated, and to which no objection has been timely Filed or, if Filed, is allowed by a Final Order.

**1.01.04**        **Allowed Secured Claim** means any Allowed Claim secured by a lien, security interest, or other charge or interest in property in which the Debtor has an interest, to the extent of the value thereof (determined in accordance with Bankruptcy Code Section 506(a)).

**1.01.05**        **Bankruptcy Code or Code** means the United States Bankruptcy Code, Title 11 of the United States Code Section 101 et seq., as amended.

**1.01.06**        **Bankruptcy Court** means the United States Bankruptcy Court for the Eastern District of Texas, Tyler Division or such other court that may have jurisdiction with respect to the reorganization of the Debtor pursuant to Chapter 11 of the Bankruptcy Code.

**1.01.07**        **Bankruptcy Rule** means the Federal Rules of Bankruptcy Procedure.

**1.01.08**        **Bar Date** means subsequent to which a proof of pre-petition Claim may not timely be Filed or the date by which proofs of claims held by governmental agencies must be filed.

**1.01.09**        **Case** means this Chapter 11 Bankruptcy Case in the Bankruptcy Court.

**1.01.10**   **Claim** shall have the meaning set forth in Bankruptcy Code Section 101(5).

**1.01.11**   **Claimant** means any person or entity having or asserting a Claim in the case.

**1.01.12**   **Class** or **Classes** mean all of the holders of Claims or Interests that the Debtor has designated pursuant to Section 1123(a)(1) of the Bankruptcy Code as having substantially similar characteristics as described in Article IV of this Plan.

**1.01.13**   **Confirmation** means the entry by the Bankruptcy Court of a Confirmation Order confirming this Plan.

**1.01.14**   **Confirmation Date** means the date on which the Confirmation Order is entered.

**1.01.15**   **Confirmation Hearing** means the hearing or hearings held before the Bankruptcy Court in which the Debtor will seek Confirmation of this Plan.

**1.01.16**   **Confirmation Order** means the Order of the Court confirming this Plan under Section 1129 of the Bankruptcy Code.

**1.01.17**   **Contested** when used with respect to a Claim, means a Claim against the Debtor (a) that is listed in the Debtor's Schedules of Assets and Liabilities as disputed, contingent, or unliquidated;(b) that is the subject of a pending action in a forum other than the Bankruptcy Court unless such Claim has been determined by Final Order in such other forum and Allowed by Final Order of the Bankruptcy Court; or (c) as to which an objection has been or may be timely filed and has not been denied by Final Order.  To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Contested Claim only to the extent of the objection.

**1.01.18**   **Creditor** shall have the meaning specified by Section 101(9) of the Code.

**1.01.19**   **Debtor** means MMD Hotel Corinth, LLC.

**1.01.20**   **Disputed Claim** means any Claim that is not an Allowed Claim.

**1.01.21**   **Effective Date**  means the first business day of the month that is thirty days after the Confirmation Date.

**1.01.22**   **Estate** means the estate created pursuant to Bankruptcy Code Section 541 with respect to the Debtor.

**1.01.23**   **Fee Claim** means a Claim under Bankruptcy Code Sections 330 or 503 for allowance of compensation and reimbursement of expenses to professionals in the Debtor's

Chapter 11 case.

**1.01.24  Filed** means delivered to the Clerk of the Bankruptcy Court.

**1.01.25  Final Order** means an Order as to which any appeal that has been taken has not been stayed following the expiration of the time for appeal or has been resolved, or as to which the time for appeal has expired.

**1.01.26  General Unsecured Claim** means Unsecured Claim that is not entitled to priority under Section 507(a) of the Bankruptcy Code.

**1.01.27  Impaired** means the treatment of an Allowed Claim pursuant to the Plan unless, with respect to such Claim, either (I) the Plan leaves unaltered the legal, equitable and contractual rights to which such Claim entitles the holder of such Claim, or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after occurrence of a default, the Debtor (A) cures any default that occurred before or after the commencement of the Chapter 11 Case on the Petition Date, other than default of the kind specified in Section 365(b)(2) of the Bankruptcy Code; (B) reinstates the maturity of such Claim as such maturity existed before such default; ©) compensates the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (D) does not otherwise alter the legal, equitable or contractual rights to which such Claim entitles the holder of such Claim; or (iii) the Plan provides that on the Effective Date, the holder of such Claim receives, on account of such Claim, cash equal to the Allowed Amount of such Claim.

**1.01.28  Petition Date** means January 6, 2015, the date the Debtor's voluntary petition was filed commencing this bankruptcy case.

**1.01.29  Plan** means this Plan of Reorganization, as it may be amended or modified from time to time as permitted herein and by the Bankruptcy Court.

**1.01.30  Pre-petition** means prior to the Petition Date.

**1.01.31  Priority Tax Claim** means a Claim entitled to priority pursuant to Bankruptcy Code Section 507(a)(8).

**1.01.32  Pro Rata** means proportionately, based on the percentage that the amount of an Allowed Claim within a particular Class bears to the aggregate amount of all Allowed Claims in such Class.

**1.01.33  Property of the Estate** means all property in which the Debtor holds a legal or

an equitable interest, including all property described in Bankruptcy Code Section 541.

**1.01.34  Rejection Claim** means any Claim arising pursuant to Bankruptcy Code Section 502(g) by reason of rejection by the Debtor of an executory contract or unexpired lease pursuant to Bankruptcy Code Sections 365 or 1123(b)(2).

**1.01.35  Secured Claim** means any Claim secured by a lien, security interest, or other charge or interest in property in which the Debtor has an interest, to the extent of the value thereof (determined in accordance with Bankruptcy Code Section 506(a)).

**1.01.36  Secured Tax Claim** means any Tax Claim which is secured by real or personal property.

**1.01.37  Secured Creditor** or **Secured Claimant** means any Claimant holding a Secured Claim.

**1.01.38  Unimpaired** means not Impaired.

**1.01.39  Unsecured Claim** means any Claim not collateralized (or the extent not fully collateralized) by assets of the Debtor.

**1.01.40  Unsecured Claimants** or **Unsecured Creditors** means any holder of an Unsecured Claim.

**1.01.41  Voidable Transfer** means all transfers voidable under Sections 544, 545, 547, 548, 549 and/or 550 of the Code or any other state or federal transfer.

**1.02      Number and Gender of Words**.  Whenever the singular number is used, it shall include the plural, and the plural shall include the singular, as appropriate to the context.  Words of any gender shall include each other gender where appropriate.

**1.03      Terms Defined in the Bankruptcy Code**.  Capitalized terms not specifically defined in section 1.01 of the Plan shall have the definitions given those terms, if applicable, in the Bankruptcy Code.

**1.04      Headings**.  The headings and captions used in this Plan are for convenience only and shall not be deemed to limit, amplify or modify the terms of this Plan nor affect the meaning thereof.

**1.05      Time Computation.**  In computing any period of time prescribed herein, the provisions of Federal Rule of Bankruptcy Procedure Rule 9006(a) shall apply.

## ARTICLE II

## CONCEPT OF THE PLAN

**2.01    Generally.** The Plan is a plan of reorganization. The Debtor shall continue its business after the Confirmation Date. The Debtor's primary business is owning and operating a hotel doing business as Quality Inn located at 2101 Highway 72 West, Corinth, Mississippi, in Alcorn County, Mississippi. The Debtor's plan proposes to pay creditors pursuant to the Claim Summary and Plan Payment Schedule attached to the accompanying Disclosure Statement.

## ARTICLE III

## GENERAL TERMS AND CONDITIONS

**3.01.    Treatment of Claims.** This Plan is intended to resolve all Claims against the Debtor and/or property of the Debtor of whatever character, whether contingent or liquidated, or whether allowed by the Bankruptcy Court pursuant to Bankruptcy Code Section 502(a). However, only Allowed Claims will receive treatment afforded by the Plan. The Plan is designed to insure that Claimants shall receive at least as much pursuant to this Plan as they would receive in a liquidation pursuant to Chapter 7 of the Bankruptcy Code.

**3.02.    Time for Filing Claims.** The holder of any Administrative Claim other than (I) a Fee Claim, (ii) a liability incurred and paid in the ordinary course of business by the Debtor, or (iii) an Allowed Administrative Claim, must file with the Bankruptcy Court and serve on the Debtor and its respective counsel, notice of such Administrative Claim within thirty (30) days after the Effective Date. At a minimum, such notice must identify (i) the name of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim. Failure to file this notice timely and properly shall result in the Administrative Claim being forever barred and discharged.

Each Person asserting an Administrative Expense that is a Fee Claim incurred before the Effective Date shall be required to file with the Bankruptcy Court, and serve on the Debtor's counsel and the U. S. Trustee, a Fee Application within sixty (60) days after the Effective Date.

A person who is found to have received a voidable transfer shall have thirty (30) days following the date upon which the order ruling that such transfer is avoidable becomes a Final Order in which to file a Claim in the amount of such avoided transfer.

Liabilities incurred from the Petition Date through the Effective Date in the ordinary course of business shall be paid in the ordinary course of business by the Debtor.

**3.03.    Modification to the Plan.** In accordance with Bankruptcy Rule 3019, to the

extent applicable, this Plan may be modified or amended upon application of the Debtor, or corrected prior to the Confirmation Date, provided that notice and an opportunity for hearing have been given to any affected party. The Plan may be modified at any time after Confirmation and before the Effective Date, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, the circumstances warrant such modification and Debtor consents thereto in writing.

<h1 style="text-align:center">ARTICLE IV</h1>

## DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

The Debtor designates the following Classes of Claims and Interests pursuant to Bankruptcy Code Section 1123. The Debtor shall pay all fees assessed by the Office of the United States Trustee until this Case is closed by the Court or the Debtor is otherwise released from such obligations by the Court.

**Class 1** consists of any Allowed Administrative Claims.

**Class 2** consists of any Allowed Secured Property Tax Claims.

**Class 3** consists of any Allowed Priority Tax Claims.

**Class 4** consists of the Allowed Secured Claim of Fidelity Bank Note 1.

**Class 5** consists of the Allowed Secured Claim of Fidelity Bank Note 2.

**Class 6** consists of the Secured Claim of the SBA.

**Class 7** consists of the General Unsecured Claims

**Class 8** consists of the Shareholder Interests.

<h1 style="text-align:center">ARTICLE V</h1>

## PROVISIONS FOR SATISFACTION OF CLAIMS AND INTERESTS

The Claims and Interests classified in Article IV hereof shall be treated in the manner set forth

in this Article V.

**5.01   Class 1 Claims.** The Class 1 Claims will be paid once Allowed in full by the Debtor, on the Effective Date or as otherwise agreed to by the Claimants in this Class.  These

claims are priority claims pursuant to Section 507(a) of the Bankruptcy Code. These claims include claims for Choice Hotels ($25,347.23), Debtor's attorney's fees, and U.S. Trustee's fees. U.S. Trustee's fees must be paid until the case is closed. The Debtor shall file quarterly reports following confirmation and until the case is closed. The Class 1 Claims may agree to a different treatment. The executory contract between Debtor and Choice Hotels shall be assumed, as of the Effective Date. As a condition to the assumption of the Franchise Agreement, (a) on the Effective Date, the Debtor will pay to Choice Hotels all of the pre-petition unpaid franchise fees in the amount of $25,347.23 and (b) the Debtor will secure funding to pay the PIP on terms approved by Choice Hotels to complete the obligations under the PIP by December 31, 2018.

    **5.02.   Class 2 Claims**. The Class 2 Claims consist of the claims of City of Corinth $24,937.32; Alcorn County $11,559.65 and Gregg County $22,018.18. The claim of Gregg County is disputed and not scheduled to be paid under the Plan, in the absence of an order from the Bankruptcy Court allowing such claim.

    The Class 2 Claims are secured claims with liens that will follow the collateral securing such claims and to the extent that such collateral is surrendered either prior to or as part of this Plan such secured liens and claims shall follow the collateral and shall not be paid by the Debtor as part of this Plan. The Class 2 Allowed Claims that relate to collateral or property being retained by the Debtor as part of the Plan shall be paid once Allowed over sixty (60) months from the Petition Date with interest on such amounts at the rate of 12% per annum until paid in full. The payments shall be made to the extent of pre-petition tax escrow on hand (if any) and then monthly payments on the unpaid balance shall be made in equal monthly payments on the Effective Date and shall continue on the first day of each month thereafter until paid in full.

    The Class 2 Claims shall accrue interest from the Petition Date at the rate of 1% per month from the Petition Date through the Effective Date of the Plan and 12% per annum following the Effective Date until paid in full. These creditors shall retain their senior liens to secure their claims until paid in full under this Plan. In the event that the Debtor disputes such claim, the payments will be applied to the undisputed amount of the claim as ultimately allowed. While resolution of any such objection is pending, payments pursuant to the Plan shall be applied to the undisputed portion of the claim as ultimately allowed. In the event of a default under the plan, counsel for holder of a claim in this class shall provide written notice of the default to the Debtor at 3501 Hwy 259 North Kilgore, TX 75662 with a copy to counsel for the Debtor at 12720 Hillcrest Road, Suite 625, Dallas, Texas 75230. Such default shall be cured within 15 business days of the date of transmission of such notice of default. In the event the default is not cured, the claimant shall be entitled to pursue all amounts owed pursuant to state law outside of the Bankruptcy Court. The claimants shall only be required to provide two notices of default. Upon a third event of default, the claimant shall be entitled to collect all amounts owed pursuant to state law outside of the Bankruptcy Court without further notice. Failure to pay post-petition taxes prior to delinquency shall constitute an event of default.

The Class 2 Claims are Impaired and the holders of the Class 2 Claims are entitled to vote to accept or reject the Plan.

**5.03.   Class 3 Claims.** The Class 3 Priority Claims will be paid as Allowed as follows:

These claims will be paid in equal monthly payments over five (5) years from the Petition Date with interest on such amounts at the rate of 4.5% per annum from the Effective Date until paid in full. These claims are priority claims.  A failure by the Reorganized Debtor to make a payment to the priority tax creditors pursuant to the terms of the Plan shall be an Event of Default. If the Reorganized Debtor fails to cure and Event of Default as to such payments within ten (10) days after receipt of written notice of default from the priority tax creditors, then the priority tax creditors may (a) enforce the entire amount of its claim; (b) exercise any and all rights and remedies the priority tax creditors may have under applicable state law; and/or (c) seek such relief as may be appropriate in the Court. In the event of a default under the plan, counsel for holder of a claim in this class shall provide written notice of the default to the Debtor at 3501 Hwy 259 North Kilgore, TX 75662 with a copy to counsel for the Debtor at 12720 Hillcrest Road, Suite 625, Dallas, Texas 75230.  The claimants shall only be required to provide two notices of default. Upon a third event of default, the claimant shall be entitled to collect all amounts owed pursuant to state law outside of the Bankruptcy Court without further notice.

The Class 3 Claims consist of:

| | |
|---|---|
| Misssissippi State Sales Tax | $5,537.00 |
| City of Corinth Sales Tax | $1,852.02 |
| Alcorn County Tax collector office | $927.38 |
| Employment Security Commission | $183.55 |
| Mississippi State Payroll tax | $378.00 |
| IRS | $2,041.86 |

The Class 3 Claims are Impaired and the holders of the Class 3 Claims are entitled to vote to accept or reject the Plan.

**5.04.   Class 4 Claim.** The Class 4 Claim will be paid as Allowed as follows:

The Class 4 Claim is the Allowed Secured Claim of Fidelity Bank for Promissory Note and Loan and Security Agreement, and other documents executed therewith (collectively the "Loan Documents"), executed by Debtor in favor of Fidelity or about November 29, 2007 in the original principal amount of $1,384,606.00 ("Note 1").

Note 1 shall be allowed in the amount of $1,359,339.95 ("Allowed Secured Claim").  The Allowed Secured Claim shall be paid in full on or before November 29, 2032.  Payment on the

Allowed Secured Claim shall be based on a 25 year amortization period at a fixed interest rate of four and eighty-six percent (4.86%) paid in equal monthly installments beginning on the Effective Date and continuing on the first day of each month thereafter until November 29, 2032, at which time a final payment will be due consisting of all unpaid principal and interest on the Allowed Secured Claim.

The Allowed Secured Claim shall bear interest per annum at a fixed interest rate of 4.86% for 60 months beginning on the Effective Date of the Plan. The interest rate shall adjust every 60 months following the Effective Date. The adjusted interest rate shall be equal to the five (5) year Seattle Federal Home Loan Long Term, Fixed Advanced Bullet Rate plus three and 75/100ths percent (3.75%). The adjusted interest rate shall be the rate in effect on the last business day immediately preceding the expiration of the 60 month period.

The Allowed Secured Claim shall be reduced by payments made to Fidelity Bank during the Bankruptcy proceeding and those amounts shall be credited as principal reduction on the Allowed Secured Claim.

The unmodified terms of Fidelity Bank's pre-petition Loan Documents are not modified by the Plan or Confirmation Order unless specifically stated in the Plan. Fidelity Bank shall retain all of its liens and security interests as originally provided in its Loan Documents until paid in full pursuant to the terms of the Plan, at which time it shall release its liens on the Debtor's property. The Plan terms will control over contradictory terms in the Loan Documents and to the extent a term is not modified in the Loan Documents it will remain in effect.

The Class 4 Claim is Impaired and the holder of the Class 4 Claim is entitled to vote to accept or reject the Plan

     **5.05.**   **Class 5 Claim.** The Class 5 Claim will be paid as Allowed as follows:

The Class 5 Claim is the Allowed Secured Claim of Fidelity Bank for the Promissory Note, Loan Agreement and Security Agreement and other documents executed therewith (collectively the "Loan Documents"), executed by Debtor in favor of Fidelity Bank dated April 12, 2011, in the original principal amount of $200,000.00 ("Note 2"). Note 2 shall be allowed in the amount of $197,142.59 ("Allowed Secured Claim") and shall be paid in full on or before November 29, 2032.

The Allowed Secured Claim shall bear interest per annum at a fixed interest rate of six and sixty-three percent (6.63%) through April 12, 2016 at which time the interest rate may change as set forth in the Loan Documents between the Debtor and Fidelity Bank.

Payments on the Allowed Secured Claim shall be calculated based on a 25 year amortization period at the initial interest rate of 6.63%. After April 12, 2016, payments shall be

calculated based on a 25 year amortization period along with the applicable adjusted interest rate. Payments shall begin on the Effective Date and shall be paid in equal monthly installments beginning on the Effective Date and continuing on the first day of each month thereafter until November 29, 2032, at which time a final payment will be due consisting of all unpaid principal and interest on the Allowed Secured Claim.

The Allowed Secured Claim shall be reduced by payments made to Fidelity Bank during the Bankruptcy proceeding and those amounts shall be credited as principal reduction on the Allowed Secured Claim.

The unmodified terms of Fidelity Bank's Loan documents are not modified by the Plan or Confirmation Order unless specifically stated in the Plan. Fidelity Bank shall retain all of its liens and security interests as originally provided in its Loan Documents until paid in full pursuant to the terms of the Plan, after which time it shall release its liens on the Debtor's property. The Plan terms will control over contradictory terms in the Loan Documents and to the extent a term is not modified in the Loan Documents it will remain in effect.

The Class 5 Claim is Impaired and the holder of the Class 5 Claim is entitled to vote to accept or reject the Plan.

5.06.   **Class 6 Claims.**  The Class 6 Claim is the Allowed Secured Claim of the SBA and will be paid as Allowed as follows:

The Class 6 Claim is the Allowed Secured Claim of the SBA and shall be allowed in the amount of $100,000.00 ("Allowed Secured Claim"). The Claim shall be paid in full over five years with interest on such Allowed Secured Claim at the rate of five percent (5%), amortized over 25 years. The payments shall be made in equal monthly payments beginning on the Effective Date and shall continue on the first day of each month thereafter until paid in full.

The Class 6 Claim is Impaired and the holder of the Class 6 Claim is entitled to vote to accept or reject the Plan. The SBA shall retain all of its liens and security interests as originally provided in its Loan Documents until paid as set forth in this Class 6, after which time it shall release its liens on the Debtor's property.

5.07.   **Class 7 Claims.**  The Class 7 Claims will be paid as Allowed as follows:

The Class 7 Claims as Allowed General Unsecured Claims shall be paid once Allowed at 5% of their claims over five (5) years. The payments shall be made in equal monthly payments on the Effective Date and shall continue on the first day of each month thereafter until 5% of their claims are paid.

The holders of the Class 7 Claims are:

| Claimant | Claim Amount | Amount Paid in Plan |
|---|---|---|
| IRS | 2,865.41 | 143.27 |
| Royal Cup | 2,863.39 | 143.17 |
| Alcorn County Electric | 3,025.52 | 151.28 |
| Alcorn County Electric | 860.98 | 43.05 |
| AT&T Global | 49.86 | 2.49 |
| AT&T Global | 1,547.92 | 77.40 |
| AT&T Global | 160.60 | 8.03 |
| Booking.com | 199.33 | 9.97 |
| Carbon Golden Malted | 435 | 21.75 |
| Comcast Cable | 6,248.02 | 312.40 |
| Comcast Cable | 203.90 | 10.20 |
| Comcast Cable | 102.90 | 5.15 |
| Corinth Water & Gas | 1,133.65 | 56.68 |
| Corinth Water & Gas | 77.90 | 3.90 |
| Corinth Water & Gas | 2,241.00 | 112.05 |
| Ecolab | 1,150.99 | 57.55 |
| Gold Bond Pest Control, LLC | 1,318.24 | 65.91 |
| Handy-Man Rentals, Inc. | 75.11 | 3.76 |
| Hardwick and Company, PA | 534.49 | 26.72 |
| HD Supply | 2,480.06 | 124.00 |
| Magnolia Regional Health Care Center | 570.00 | 28.50 |
| Maintenance USA | 522.89 | 26.14 |
| MS Logo | 800.00 | 40.00 |
| My Eres | 411.40 | 20.57 |
| Orkin Pest Control | 1,074.97 | 53.75 |
| Royal Cup Coffee | 3,882.57 | 194.13 |
| S&D Coffee | 2,342.60 | 117.13 |
| Sysco Guest Supply | 2,206.59 | 110.33 |
| SBA | 791,480.60 | 44,574.03 |
| Vingcard Elsafe/Assa Abloy Hospitality | 188.33 | 9.42 |
| **TOTAL** | **831,054.22** | **46,552.71** |

The Class 7 Claims are Impaired and the holders of the Class 7 Claims are entitled to vote to accept or reject the Plan.

**5.08.   Class 8 Equity Interest Holders**. The Class 8 Equity Interest Holders will be treated as follows:

On the Effective Date, all equity interests shall be cancelled.  The new equity interests in the Debtor shall be issued as follows:

| | |
|---|---|
| Vimal Patel | 55% |
| Shilpa Patel | 10% |
| Mehul Patel | 20% |
| Manhar Patel | 10% |
| Sandip Desai | 5% |

The new shareholders are contributing to the Debtor $26,000.00 total.  These funds shall be deposited into the Debtor's counsel's trust account prior to the Confirmation Date.  If the Plan is not Confirmed, the $26,000.00 will be returned to the proposed new shareholders in their respective shares.

The Debtor believes that the Plan will not violate the absolute priority rule and will be consensual as to the unsecured creditors.  In the event that the unsecured creditors do not vote for the Plan, and the Bankruptcy Court requires an auction, to avoid an absolute priority issue then: (i) the existing shareholder interests will be cancelled on the Effective Date, (ii) the new equity interests in the Debtor shall be sold at an Auction sale as set forth herein, and (iii) the new equity interests in the Debtor shall be issued to the successful bidder for the interest in the Debtor at the Auction, subject to the terms of this Plan.  If the Plan is not confirmed by the Court at the Confirmation Hearing, then the sale of the equity interests shall not proceed and the sale shall be cancelled. The Debtor shall remain the same corporate entity, without change in its structure.

The auction (the "Auction") under the Plan shall be held at the Confirmation Hearing. The auction procedure is that any person or entity that desires to be considered for a possible bid must serve on counsel for the Debtor, Choice Hotels and Fidelity Bank at least fourteen (14) business days prior to the Confirmation Hearing the following bid and supporting information (collectively, a "Bid") (i) a copy of its proposed bid containing the cash purchase price for the equity interests in Debtor, and all terms and conditions of the Bid, (ii) information identifying the proposed purchaser and all persons or entities who will own or control the proposed purchaser, (iii) information identifying the financial ability of the proposed purchaser and all persons or entities who will own or control the proposed purchaser to perform the Plan, (iv) information identifying the relevant experience and management of the proposed purchaser and all persons or

entities who will own or control the proposed purchaser to perform the Plan, (v) an agreement by the proposed purchaser, and all persons who own or control the proposed purchaser, to execute at closing, a purchaser guaranty, in a form acceptable to Fidelity Bank. The Debtor, Choice Hotels, Fidelity Bank and any other party- in- interest will provide notice of the bids received three (3) business days after receipt of the Bids and any objections to the Bids must be filed at minimum three (3) business prior to confirmation and ruled upon by the court.

If an Auction proceeds, the new equity interests in Debtor shall be sold for the highest and best bid, consistent with the terms of the Plan and subject to objections by creditors and parties- in- interest. A combined opening bid at an Auction sale is $26,000.00 for 100 percent of the new equity interests. Any Bid by another person or entity must exceed $26,000.00 by at least $10,000 and must provide for a full and unconditional guaranty of payment and performance of the obligations due to Choice Hotel and Fidelity Bank and the property tax creditors as provided above, by the proposed purchaser and all of its insiders or controlling persons, all in form and substance acceptable to Choice Hotel and Fidelity Bank. After consulting with Choice Hotel and Fidelity Bank, the Debtor can propose to take the highest and best cash offer for the purchase of the new equity interests in the Debtor at the time of the hearing on Confirmation, so long as the cash purchase price exceeds $26,000.00 and provides the required guaranty and assumption agreement acceptable to Choice Hotel and Fidelity Bank and provided that all creditors and parties-in- interest may object to any Bid and the proposed sale to a proposed purchaser. Even if a person or entity other than the proposed shareholders are the successful bidders for the new membership interests in Debtor under this Plan, the Plan and the rights and treatment of creditors and claims under the Plan are not impaired, changed or affected. Any winning bidder for the new equity interests in the Debtor acquires such new equity interests subject to (and must expressly assume): (i) the Plan, (ii) the Debtor's duties and obligations under the Plan, Fidelity Bank's loan documents, (iii) the allowance and treatment of claims, rights and liens under the Plan and the rights and remedies of creditors under the Plan, including payment of Fidelity Bank's Allowed Secured Claim and the obligations of the Debtor and the purchaser at the Closing. The Debtor shall solicit such bids by noticing this Plan out to the creditors in this case. The equity interest holders are impaired under the Plan. If the successful purchaser at the Auction is other than the proposed shareholders, then the successful purchaser and all persons who own or control the proposed purchaser, shall execute and deliver a purchaser guaranty in favor of Fidelity Bank.

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF PLAN

**6.01    Implementation of Plan**. This Plan will be implemented, pursuant to § 1123(a)(5) of the Code, by the commencement of payments as called for above.

## ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 7.01.   Assumption and Rejection of Executory Contracts and Unexpired Leases.

Debtor shall assume, pursuant to Bankruptcy Code Section 1123(b)(2), by separate Motions and order unexpired leases of non-residential real property and executory contracts prior to the Confirmation Date or as part of Confirmation of a Plan in this case, except that the executory contract between Debtor and Choice Hotel shall be assumed, effective as of the Effective Date.  As a condition to the assumption of the Franchise Agreement, (a) on the Effective Date, the Debtor will pay to Choice Hotels all of the pre-petition unpaid franchise fees in the amount of $25,347.23 and (b) the Debtor will secure funding to pay the PIP on terms approved by Choice Hotels to complete the obligations under the PIP by December 31, 2018.

**7.02.   Reservation of Rights.** The Debtor shall have the right to assume or reject, pursuant to Bankruptcy Code Section 365, prior to the Confirmation Date, any executory contract or unexpired lease of real property (to the extent permitted under the Bankruptcy Code) and to the terms of this Plan.

**7.03.   Bar Date for Claims Based on Rejection.**   If the rejection of an executory contract or an unexpired lease by the Debtor results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtor or their properties or agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtor, by the earlier of (a) the end of the month following the period in which the Effective Date occurs or (b) such other deadline as the Court may set for asserting a Claim for such damages. Any Rejection Claim arising from the rejection of an unexpired lease or executory contract shall be treated as a General Unsecured Claim; *provided, however*, that any Rejection Claim based upon the rejection of an unexpired lease of real property either prior to the Confirmation Date or upon the entry of the Confirmation Order shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements. Nothing contained herein shall be deemed an admission by the Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtor of any objections to such Claim if asserted.

### ARTICLE VIII

### PROVISIONS FOR THE RETENTION, ENFORCEMENT, SETTLEMENT, OR ADJUSTMENT OF CLAIMS BELONGING TO THE DEBTOR AND THE ESTATE INCLUDING PREFERENCES AND CONVEYANCES

**8.01.   The Debtor's Causes of Action.**  Except as otherwise released pursuant to the Plan, all Claims recoverable under Section 550 of the Bankruptcy Code, all Claims against third parties on account of an indebtedness, and all other Claims of any kind or character whatsoever

owed to or in favor of the Debtor or the Estate to the extent not specifically compromised and released pursuant to this Plan or any agreement referred to and incorporated herein, are hereby preserved and retained for enforcement by the Debtor for the benefit of the Creditors subsequent to the Effective Date.

      **8.02.**    **Objections to Claims.**  Any party authorized by the Bankruptcy Code may object to the allowance of Pre-petition Claims at any time prior to sixty (60) days after the Effective Date and, as to Rejection Claims, at any time prior to sixty (60) days after the filing of any such Rejection Claim. Any proof of Claim filed after the Court sets bar dates shall be of no force and effect and shall be deemed disallowed. All Contested Claims shall be litigated to Final Order; *provided, however,* that the Debtor may compromise and settle any Contested Claim, subject to the approval of the Bankruptcy Court. Notwithstanding the foregoing, a person who is found to have received a voidable transfer shall have thirty (30) days following the date upon which the order ruling that such transfer is avoidable becomes a Final Order in which to file a Claim in the amount of such avoided transfer.

      No distributions under this Plan shall be made to the holder of a Claim that is in dispute, unless and until such Claim becomes an Allowed Claim. If a Claim is disputed in whole or in part because the Debtor asserts a right of offset against such Claim or recoupment against the holder of such Claim, then, if and to the extent the Claim giving rise to the offset or recoupment is sustained by Final Order, the Claim in dispute shall be reduced or eliminated and, if applicable, the holder of such Claim shall be required to pay the amount of such offset or recoupment, less the amount of its Allowed Claim. In addition, any party authorized by the Bankruptcy Code, at anytime, may request that the Court estimate any contingent, disputed or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of any prior objections.

**ARTICLE IX**

**EFFECT OF CONFIRMATION**

      **9.01.**    **Discharge and Release of Debtor.**  Pursuant to Bankruptcy Code Section 1141(d)(2), confirmation of this Plan discharges the Debtor from all liabilities save and except those treated in accordance with the Plan and nothing shall release the Debtor from the terms of the Plan.

      **9.02.**    **Released Entities.**  None of the officers, financial advisors, attorneys, or employees of the Debtor (collectively the "Released Entities") shall have any liability for actions taken or omitted to be taken in good faith under or in connection with the Plan.

      **9.03.**    **Legal Binding Effect.**  The provisions of this Plan, pursuant to the Bankruptcy Code Section 1141 shall bind the Debtor and all Creditors, whether or not they accept this Plan. The distributions provided for Claimants shall not be subject to any Claim by another creditor or interest holder by reason of any assertion of a contractual right of subordination.

**Page 17 of 22**

**9.04.    Permanent Injunction.** Confirmation of the Plan shall result in the issuance of a permanent injunction against the commencement or continuation of any judicial, administrative, or other action or proceeding on account of any Claims against the Debtor and any other entity against whom prosecution of the any Claims could result in a Claim being asserted against the Debtor that could arise directly or indirectly out of a claim against the **Debtor**.

From and after the Confirmation Date, all holders of Claims against the Debtor are restrained and enjoined (a) from commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim against the Debtor; (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order against the Assets or the Debtor; (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Assets, or the Debtor; (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtor; and (e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; *provided, however,* that each holder of a Contested Claim may continue to prosecute its proof of Claim in the Bankruptcy Court and all holders of Claims shall be entitled to enforce their rights under the Plan and any agreements executed or delivered pursuant to or in connection with the Plan. Such restraint shall continue until the Debtor has been granted a discharge by the Court or such creditor is paid in full as called for by the Plan.

### ARTICLE X

### MISCELLANEOUS PROVISIONS

**10.01.    Request for Relief Under Bankruptcy Code Section 1129.** In the event any Impaired Class shall fail to accept this Plan in accordance with Bankruptcy Code Section 1129(a), the Debtor reserves the right to, and does hereby request the Bankruptcy Court to confirm the Plan in accordance with Bankruptcy Code Section 1129(b).

**10.02.    Revocation.** The Debtor reserves the right to revoke and withdraw this Plan at any time prior to the Confirmation Date.

**10.03.    Effect of Withdrawal or Revocation.** If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

**10.04.    Due Authorization by Creditors.** Each and every Claimant who elects to participate in the distributions provided herein warrants that it is authorized to accept in consideration of its Claim against the Debtor the distributions provided in the Plan and that there

are no outstanding commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by it under this Plan.

       **10.05.**   <u>Entire</u> <u>Agreement</u>. This Plan, as described herein, the Confirmation Order, and all other documents and instruments to effectuate this Plan provided for herein, constitute the entire agreement and understanding among the parties hereto relating to the subject matter hereof and supersedes all prior discussions and documents.

       **10.06.**   <u>Section</u> <u>1146</u> <u>Exemption</u>. Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange or any security under this Plan or the making or delivery of any instrument or transfer pursuant to, in implementation of or as contemplated by this Plan or the transfer of any property pursuant to this Plan shall not be taxed under any federal, state or local law imposing a stamp, transfer or similar tax or fee.

       **10.07.**   <u>Provisions</u> <u>Governing</u> <u>Distributions</u>. All payments and distributions under the Plan shall be made by the Debtor as indicated. Any payments or distributions to be made by the Debtor pursuant to the Plan shall be made as soon as reasonably practicable after the Effective Date, except as otherwise provided for in the Plan, or as may be ordered by the Bankruptcy Court. Any payment or distribution by the Debtor pursuant to the Plan, to the extent delivered by the United States Mail, shall be deemed made when deposited into the United States Mail.

       Payments of Cash to be made by the Debtor pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

       Distributions and deliveries to holders of Allowed Claims shall be made at the addresses set forth on the proofs of Claim or proofs of interest filed by such holders (or at the last known addresses of such holders if no proof of Claim or proof of interest is filed). All Claims for undeliverable distributions shall be made on or before the second anniversary of the Effective Date. After such date, all unclaimed property shall remain the property of the Debtor and the Claim of any other holder with respect to such unclaimed property shall be discharged and forever barred.

       Checks issued by the Debtor in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of delivery thereof. Requests for reissuance of any check shall be made directly to the Debtor by the holder of the Allowed Claim to whom such check originally was issued. Any claim in respect of such a voided check within ninety (90) days after the date of delivery of such check. After such date, all Claims in respect of void checks shall be discharged and forever barred, and the amount of such checks shall become Unclaimed Property and returned to the Debtor.

       No interest shall be paid on any Claim unless, and only to the extent that, the Plan specifically provides otherwise.

**10.08.**   **Governing Law.**   Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

**ARTICLE XI**

**MODIFICATION OF THE PLAN**

**11.01**   The Debtor may propose amendments to or modifications of this Plan under Bankruptcy Code Section 1127 at any time prior to Confirmation upon notice to all parties affected thereby and providing such parties an opportunity to be heard on the proposed amendment. After Confirmation, the Debtor may remedy any defects or omissions or reconcile any inconsistencies in this Plan or in the Final Order in such manner as may be necessary to carry out the purpose and intent of this Plan so long as the interests of Claimants or Interest holders are not materially and adversely affected

**ARTICLE XII**

**RETENTION OF JURISDICTION**

Notwithstanding confirmation of the Plan or the Effective Date having occurred, the Court will retain jurisdiction for the following purposes:

**12.01**   **Allowance of Claims.**   To hear and determine the allowability of all Claims upon objections to such Claims.

**12.02**   **Executory Contracts and Unexpired Leases Proceedings.**   To act with respect to proceedings regarding the assumption of any executory contract or unexpired lease of the Debtor pursuant to §§ 365 and 1123 of the Code and Article VII of the Plan.

**12.03**   **Plan Interpretation.**   To resolve controversies and disputes regarding the interpretation of the Plan.

**12.04**   **Plan Implementation.**   To implement and enforce the provisions of the Plan and enter orders in aid of confirmation and implementation of the Plan.

**12.05**   **Plan Modification.**   To modify the Plan pursuant to § 1127 of the Code and applicable Bankruptcy Rules, except that no modification shall be made to the Plan that would impair, diminish or affect in any way the rights of participants of any Classes of the Plan without the consent of such Class.

**12.06    Adjudication of Controversies.**  To adjudicate such contested matters and adversary proceedings as may be pending or subsequently initiated in the Court against the Debtor.

**12.07    Injunctive Relief.**  To issue any injunction or other relief as appropriate to implement the intent of the Plan, and to enter such further orders enforcing any injunctions or other relief issued under the Plan or in the Confirmation Order.

**12.08    Interpleader Action.**  To entertain interpleader actions concerning assets to be distributed or other assets of the Estate.

**12.09    Correct Minor Defects.**  To correct any defect, cure any omission or reconcile any inconsistency or ambiguity in the Plan, the Confirmation Order or any document executed or to be executed in connection therewith, as may be necessary to carry out the purposes and intent of the Plan, provided that the rights of any holder or an Allowed Claim are not materially and adversely affected thereby.

**12.10    Authorization of Fees and Expenses.**  To review and authorize payment of professional fees incurred prior to the Effective Date.

**12.11    Post-Confirmation Orders Regarding Confirmation.**  To enter and implement such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, reversed, revoked, modified, or vacated.

**12.12    Final Decree.**  To enter a final decree closing the Case pursuant to Bankruptcy Rule 3022.


Dated: March 8, 2015

                                    Respectfully submitted,

                                    /s/  Arthur Ungerman
                                    ARTHUR UNGERMAN
                                    Attorney at Law
                                    12720 Hillcrest Road
                                    Suite 625
                                    Dallas, Texas 75230
                                    (972) 239-9055 Telephone
                                    (972) 239-9886 Facsimile
                                    COUNSEL FOR THE DEBTOR

                                    /s/ Mahesh Patel

Mahesh Patel
Managing Member of the Debtor
MMD Hotel Corinth, LLC

# EXHIBIT "2"

**MMD Hotel Corinth, LLC**
Statement of Revenues and Expenses - Income Tax Basis 2012

| Sales | 2012 | Monthly Avg |
|---|---|---|
| Total Sales | 984,611.70 | |
| Gross Profit | 984,611.70 | 82,050.98 |
| **Operating Expenses** | | |
| AUTO EXPENSE | 44.00 | |
| BANK CHARGES | 918.28 | |
| BREAKFAST BAR/FOOD | 51,001.61 | |
| CASH OVER/SHORT | 2,895.37 | |
| CONTRACT LABOR | 1,030.00 | |
| CREDIT CARD FEES | 19,804.76 | |
| CONTRIBUTIONS | 1,800.00 | |
| COMMISSION - TRAVEL AGENT F | 3,361.15 | |
| DUES & PUBLICATIONS | 1,539.80 | |
| EQUIPMENT RENTAL | 1,182.75 | |
| FRANCHISE FEES | 80,013.97 | |
| FOOD & ENTERTAINMENT | 88.94 | |
| GIFTS & FLORALS | 41.69 | |
| HOUSEKEEPING | 14,929.63 | |
| INSURANCE - GENERAL | 32,310.33 | |
| LAUNDRY | 82.18 | |
| LEGAL & ACCOUNTING | 10,600.04 | |
| LOAN CLOSING FEES | 7,407.84 | |
| MISCELLANEOUS EXPENSE | 861.07 | |
| OFFICE SUPPLIES | 1,767.95 | |
| PEST CONTROL | 400.00 | |
| POSTAGE & METER RENTAL | 331.95 | |
| REPAIRS & MAINTENANCE | 19,813.36 | |
| SALARY | 274,575.95 | |
| OPERATING SUPPLIES | 6,605.24 | |
| TAXES - PAYROLL | 31,650.42 | |
| TAXES & LICENSES | 41,416.94 | |
| TECH SUPPORT | 2,275.34 | |
| TELEPHONE | 8,689.82 | |
| TRAVEL | 4,573.50 | |
| UTILITIES | 115,407.42 | |
| Total Operating Expenses | 737,421.30 | 61,451.78 |
| Operating Income (loss) | 247,190.40 | |
| **Other Income (Expense)** | | |
| INTEREST INCOME | 6.25 | |
| Total Other Income (Expense) | 6.25 | |
| Net Income (Loss) Before Taxes | 247,196.65 | |
| Net Income (Loss) | 247,196.65 | 20,599.72 |
| Adjustmed Items | | |
| AMORTIZATION | 3,333.24 | |
| DEPRECIATION | 107,280.61 | |
| MANAGEMENT FEES | 64,500.00 | |
| INTEREST | 175,113.85 | |
| SALARIES - MAINTENANCE | 23,757.08 | |
| SALARIES - HOUSEKEEPING | 113,432.17 | |
| SALARIES - MANAGEMENT | 69,972.90 | |
| SALARIES - FRONT DESK | 64,943.58 | |
| SALARY - BREAKFAST | 2,470.23 | |
| | 274,575.96 | |

## MMD HOTEL CORINTH LLC
### Statement of Revenues and Expenses - Income Tax Basis 2013

| Sales | 2013 | Monthly Avg |
|---|---|---|
| **Total Sales** | 957,160.47 | |
| **Gross Profit** | 957,160.47 | 79,763.37 |

**Operating Expenses**

| | | |
|---|---|---|
| AUTO EXPENSE | 189.85 | |
| BANK CHARGES | 1,332.39 | |
| CREDIT CARD FEES | 18,896.46 | |
| DUES & PUBLICATIONS | 1,063.90 | |
| EQUIPMENT RENTAL | 3,109.60 | |
| FRNACHISE FEES | 142,864.57 | |
| HOUSEKEEPING | 12,521.51 | |
| INSURANCE - GENERAL | 29,705.04 | |
| LEGAL & ACCOUNTING | 20,438.39 | |
| LOAN CLOSING FEES | 5,555.88 | |
| MISCELLANEOUS EXPENSE | 1,349.51 | |
| PAYROLL | 236,994.52 | |
| POSTAGE & METER RENTAL | 317.02 | |
| REPAIRS & MAINTENANCE | 10,951.07 | |
| SUPPLIES | 52,804.15 | |
| TAXES - PAYROLL | 29,795.85 | |
| TAXES & LICENSES | 37,590.08 | |
| TECH SUPPORT | 1,368.00 | |
| TELEPHONE | 10,204.39 | |
| TRAVEL | 9,866.78 | |
| UTILITIES | 99,761.80 | |
| **Total Operating Expenses** | 726,680.76 | 60,556.73 |
| **Operating Income (loss)** | 230,479.71 | **19,206.64** |
| | 19,206.64 | |
| **Net Income (Loss)** | 230,479.71 | **19,206.64** |

**Adjusted Items**

| | | |
|---|---|---|
| AMORTIZATION | 3,333.24 | |
| DEPRECIATION | 87,751.71 | |
| MANAGEMENT FEES | 50,500.00 | |
| INTEREST | 106,502.14 | |
| PROFESSIONAL FEES | 11,000.00 | |
| Manager Payroll | 55,000.00 | |

## MMD Hotel Corinth, LLC
### Statement of Revenues and Expenses - Income Tax Basis 2014

| Sales | 2014 | Monthly |
|---|---|---|
| **Total Sales** | 938,004.60 | |
| **Gross Profit** | 938,004.60 | |
| **Operating Expenses** | | |
| AUTO EXPENSE | 142.00 | |
| BANK CHARGES | 1,282.48 | |
| CREDIT CARD FEES | 17,844.01 | |
| DUES & PUBLICATIONS | 87.50 | |
| EQUIPMENT RENTAL | 1,524.87 | |
| FRANCHISE FEES | 120,219.44 | |
| INSURANCE - GENERAL | 32,465.56 | |
| LEGAL & ACCOUNTING | 15,947.10 | |
| MISCELLANEOUS EXPENSE | 1,946.25 | |
| PAYROLL | 223,173.89 | |
| POSTAGE & METER RENTAL | 407.71 | |
| REPAIRS & MAINTENANCE | 29,521.76 | |
| SUPPLIES | 48,411.51 | |
| TAXES - PAYROLL | 22,661.36 | |
| TAXES & LICENSES | 37,906.00 | |
| TELEPHONE | 16,806.54 | |
| TRAVEL | 24,820.40 | |
| UTILITIES | 107,710.66 | |
| **Total Operating Expenses** | 702,879.04 | 58,573.25 |
| **Operating Income (loss)** | 235,125.56 | **19,593.80** |
| **Net Income (Loss)** | 235,125.56 | **19,593.80** |
| **ADJUSTED ITEMS** | | |
| AMORTIZATION | 3,333.33 | |
| DEPRECIATION | 80,171.44 | |
| MANAGEMENT FEES | 64,500.00 | |
| INTEREST | 4,620.27 | |
| Loan Closing | 35,000.00 | |
| PROFESSIONAL FEES | 10,927.47 | |
| SALARY MANAGEMENT | 50,769.12 | |

EXHIBIT "3"

## MMD HOTEL CORINTH LLC

### Cashflow Budget

| Description | One time Payment | Monthly | 1st Year | Monthly | 2nd Year | Monthly | 3rd Year | Monthly | 4th Year | Monthly | 6th Year |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Income** | | | | | | | | | | | |
| Sales | | 79,000 | 948,000 | 79,000 | 948,000 | 79,000 | 948,000 | 79,000 | 948,000 | 79,000 | 948,000 |
| **Total Income** | | | | | | | | | | | |
| Expenses | | 62,000 | 744,000 | 62,000 | 744,000 | 62,000 | 744,000 | 62,000 | 744,000 | 62,000 | 744,000 |
| Payment for PIP Finance | | 5,000 | 60,000 | 5,000 | 60,000 | 5,000 | 60,000 | 5,000 | 60,000 | 5,000 | 60,000 |
| Net Cash Available for Plan Creditors | | 12,000 | 144,000 | 12,000 | 144,000 | 12,000 | 144,000 | 12,000 | 144,000 | 12,000 | 144,000 |
| **Class 2 - Secured Property Tax Claims** | | | | | | | | | | | |
| City of Corinth 2014 Property Taxes | | 555 | 6,657 | 555 | 6,657 | 555 | 6,657 | 555 | 6,657 | 555 | 6,657 |
| Alcorn County Property Taxes | | 257 | 3,086 | 257 | 3,086 | 257 | 3,086 | 257 | 3,086 | 257 | 3,086 |
| Gregg County 2014-2015 Property Taxes | | - | | - | | - | | - | | - | |
| **Class 3 - Priority Occupancy Tax Claims** | | | | | | | | | | | |
| MS State Sales Tax | | 104 | 1,243 | 104 | 1,243 | 104 | 1,243 | 104 | 1,243 | 104 | 1,243 |
| City of Corinth Sales Tax | | 35 | 414 | 35 | 414 | 35 | 414 | 35 | 414 | 35 | 414 |
| Alcorn County Tax collector office | | 17 | 207 | 17 | 207 | 17 | 207 | 17 | 207 | 17 | 207 |
| Employment security commission | | 3 | 41 | 3 | 41 | 3 | 41 | 3 | 41 | 3 | 41 |
| MS State Payroll tax | | 7 | 85 | 7 | 85 | 7 | 85 | 7 | 85 | 7 | 85 |
| IRS | | 38 | 457 | 38 | 457 | 38 | 457 | 38 | 457 | 38 | 457 |
| **Class 4 - Secured Claim of Bank** | | | | | | | | | | | |
| Fidelity Bank | | 7,836 | 94,033 | 7,836 | 94,033 | 7,836 | 94,033 | 7,836 | 94,033 | 7,836 | 94,033 |
| **Class 5 - Secured Claim of Bank** | | | | | | | | | | | |
| Fidelity Bank | | 1,347 | 16,166 | 1,347 | 16,166 | 1,347 | 16,166 | 1,347 | 16,166 | 1,347 | 16,166 |
| **Class 6 - SBA Secured Claim** | | | | | | | | | | | |
| SBA | | 585 | 7,015 | 585 | 7,015 | 585 | 7,015 | 585 | 7,015 | 585 | 7,015 |
| **Class 7 - General Unsecured Claims** | | | | | | | | | | | |
| SBA | | 660 | 7,915 | 660 | 7,915 | 660 | 7,915 | 660 | 7,915 | 660 | 7,915 |
| Others Listed Below | | 33 | 396 | 33 | 396 | 33 | 396 | 33 | 396 | 33 | 396 |
| **Total Plan Payment** | | 11,476 | 137,714 | 11,476 | 137,714 | 11,476 | 137,714 | 11,476 | 137,714 | 11,476 | 137,714 |
| Excess or (Short Fall) | | | 6,286 | | 6,286 | | 6,286 | | 6,286 | | 6,286 |
| Sale of Stock | 26,000 | | | | | | | | | | |
| Pay at Confirmation | (26,347) | | | | | | | | | | |
| Accumulated Cash | | | 6,939 | | 13,224 | | 19,510 | | 25,796 | | 32,082 |

# EXHIBIT "4"

# MMD HOTEL CORINTH LLC

## Claims Summary and Plan Payment Schedule

| Class | Claim Amount | Plan Treatment for Class | Monthly Payment Amount |
|---|---|---|---|
| **Class 1 - Administrative Claims** | | | |
| Choice Hotels International | 25,347.23 | Pay at Confirmation | 25,347.23 |
| **Class 2 - Secured Property Taxes** | | | |
| City of Corinth 2014 Property Taxes | 24,937.32 | Pay Over 60 Months at 12% Interest | 554.72 |
| Alcorn County Property Taxes | 11,559.65 | Pay Over 60 Months at 12% Interest | 257.14 |
| Gregg County 2014-2015 Property Tax | 22,108.18 | Disputed | 0.00 |
| **Class 3 - Priority Occupancy Tax Claims** | | | |
| MS State Sales Tax | 5,555.37 | Pay Over 60 Months 4.5% Interest | 103.57 |
| City of Corinth Sales Tax | 1,852.02 | Pay Over 60 Months 4.5% Interest | 34.53 |
| Alcorn County Tax collector office | 927.38 | Pay Over 60 Months 4.5% Interest | 17.29 |
| Employment security commission | 183.55 | Pay Over 60 Months 4.5% Interest | 3.42 |
| MS State Payroll tax | 378.00 | Pay Over 60 Months 4.5% Interest | 7.05 |
| IRS | 2,041.86 | Pay Over 60 Months 4.5% Interest | 38.07 |
| **Class 4 - Secured Claim of Bank** | | | |
| Fidelity Bank | 1,359,339.95 | Fixed Rate of 4.86 for 60 months<br>Amortized over 25 years.  Balloon Due on or before 11/29/2032 | 7,836.08 |
| **Class 5 - Secured Claim of Bank** | | | |
| Fidelity Bank | 197,142.59 | Fixed Rate of 6.63% through April 12, 2016 and then adjustable per Loan Agreement. Balloon Due on or before 11/29/2032 | 1,347.18 |
| **Class 6 - SBA Secured Claim** | | | |
| SBA | 100,000.00 | 5.0% Interest 25 Years Amortization | 584.59 |
| **Class 7 - General Unsecured Claims** | | | |
| SBA | 791,480.60 | Pay 5% over 5 Years | 659.57 |
| Others Listed Below | 39,573.62 | Pay 5% over 5 Years | 32.98 |
| **Class 8 - Shareholder Interests** | | | |
| | 26,000.00 | Cancelled and Reissued Proceeds for Sale of Stock | |
| | | * Total Plan Payment per Month | **11,476.18** |
| | | * Total Plan Payment for Year | **137,714.16** |

| Creditor | Claim Amount | Plan Payment |
|---|---|---|
| IRS | 2,865.41 | 143.27 |
| Royal Cup | 2863.39 | 143.17 |
| Alcorn County Electric | 3,025.52 | 151.28 |
| Alcorn County Electric | 860.98 | 43.05 |
| AT&T Global | 49.86 | 2.49 |
| AT&T Global | 1,547.92 | 77.40 |
| AT&T Global | 160.60 | 8.03 |
| Booking.com | 199.33 | 9.97 |
| Carbon Golden Malted | 435 | 21.75 |
| Comcast Cable | 6,248.02 | 312.40 |
| Comcast Cable | 203.90 | 10.20 |
| Comcast Cable | 102.90 | 5.15 |
| Corinth Water & Gas | 1,133.65 | 56.68 |
| Corinth Water & Gas | 77.90 | 3.90 |
| Corinth Water & Gas | $2,241.00 | 112.05 |
| Ecolab | 1,150.99 | 57.55 |
| Gold Bond Pest Control, LLC | 1,318.24 | 65.91 |
| Handy-Man Rentals, Inc. | 75.11 | 3.76 |
| Hardwick and Company, PA | 534.49 | 26.72 |
| HD Supply | 2,480.06 | 124.00 |
| Magnolia Regional Health Care Center | 570.00 | 28.50 |
| Maintenance USA | 522.89 | 26.14 |
| MS Logo | 800.00 | 40.00 |
| My eres | 411.40 | 20.57 |
| Orkin Pest Control | 1,074.97 | 53.75 |
| Royal Cup Coffee | 3,882.57 | 194.13 |
| S&D Coffee | 2,342.60 | 117.13 |
| Sysco Guest Supply | 2,206.59 | 110.33 |
| SBA | 791,480.60 | 39,574.03 |
| Vingcard Elsafe/Assa Abloy Hospitality | 188.33 | 9.42 |
| | 831,054.22 | 41,552.71 |